THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRYAN SMITH, Defendant-Appellant.

Second District   Nos. 2—89—0697, 2—89—0698 cons.

Opinion filed June 7, 1991.

G. Joseph Weller and Robert C. Cooper, both of State Appellate Defender's Office, of Elgin, and Daniel D. Yuhas, of State Appellate Defender's Office, of Springfield, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

In this consolidated case, the defendant, Bryan Smith, appeals from 60- and 20-year sentences of imprisonment imposed on him after his plea of guilty to the offenses of felony murder and armed robbery. The court denied his motions for reconsideration of the sentences. Defendant appeals, contending his 60-year sentence for felony murder must be reduced because (a) the trial court failed to give appropriate weight to mitigating factors and his rehabilitative potential and (b) because it is unduly disparate from the sentence of his codefendant, Paul Eshom. He further contends a new sentencing hearing should be held because the murder and armed robbery sentences were improperly based on aggravating factors already inherent in the charged offenses.

The record shows the defendant and his codefendants, John Waldron and Paul Eshom, robbed a Speedway gas station and convenience mart on Milwaukee Avenue in an unincorporated area near

Wheeling shortly after 6 a.m. on September 6, 1988. During the course of the robbery, Waldron shot and killed Thomas Goings, a store employee. Less than 24 hours later, Waldron and the defendant committed an armed robbery at a local bar and were apprehended shortly thereafter. Eshom was not involved in the bar robbery, and he turned himself in to the police for his part in the Speedway felony murder offense.

The defendant first met codefendant John Waldron at a bar in the Wheeling area about 8 to 10 days before the instant offenses. Waldron asked the defendant to act as his bodyguard while he made his rounds selling drugs. For his role as Waldron's bodyguard, the defendant was to receive $50 a day and free drinks and cocaine from Waldron. The defendant and Waldron spent their 8 to 10 days together drinking at various bars and either snorting or shooting up cocaine. The defendant stated he did not see Waldron sleep during that time, and reported that he himself only had about four hours' sleep on one occasion before the instant felony murder offense and about two hours' sleep after that.

During the evening of September 5 and the early morning hours of September 6, the defendant and Waldron were at the apartment shared by Dawn Milne and Paul Eshom. Eshom had known Waldron for about one year and had met the defendant once previously. Shortly before 6 a.m., Waldron awakened Eshom and asked him to give him and the defendant a ride to rob a gas station. Eshom agreed, and Dawn Milne gave Waldron and the defendant a hooded sweat shirt and a jacket. Eshom supplied Waldron with two loaded guns, a .22 caliber revolver and a .44 magnum revolver. Waldron gave the .22 caliber revolver to the defendant. Using his van, Eshom drove Waldron and the defendant to a Speedway gas station which, Waldron said, "look[ed] fine." Eshom gave the defendant a military camouflage-style hat, and the defendant and Waldron entered the gas station. Eshom remained in the van. Waldron and the defendant soon came running out of the station and the group drove away. Eshom heard Waldron say in the van that he shot the man in the station because the man hesitated. According to Michael Kremer, a witness at Waldron's trial, Waldron said that he shot the man because the man looked at him like he was a "scumbag."

The record reveals further that when Waldron and the defendant entered the gas station, the manager, Tom Hixon, and employee Thomas Goings were present. Another employee, Steve Fuessle, was back in the kitchen area of the station in the freezer. The three security video cameras were operating at the time the two men entered

the station. The two men walked up to the area of the register where Thomas Goings was, and the man in the hooded sweat shirt (Waldron) lifted up a cocked .44 revolver, pointed it at Goings and told him that he wanted all the money. The store manager then saw Goings say something but could not make out what it was. Waldron then fired a shot at Goings at close range, and Goings fell back against the rear counter. Waldron motioned to Hixon with the gun and told him he wanted all the money. Hixon gave Waldron money from both registers, and Waldron and the defendant left.

Steve Fuessle said that when he heard a bang and muffled shouting sounds, he came out of the back area and saw two men holding guns on the station manager. Testimony conflicted as to whether the defendant had his gun out at that time or not. Station manager Hixon testified the defendant did not have his gun out until he saw Fuessle and, at that time, the defendant pointed his gun at Fuessle and told him to get down on the floor, which Fuessle did.

Eshom drove Waldron and the defendant back to his and Dawn Milne's apartment, where he divided the money into three piles. The defendant went to the bathroom, where he splashed some water on his face because he was "sweating, scared." The defendant received one of the piles of money.

Waldron wanted to have Dawn Milne buy food and make breakfast, but the defendant wanted all of them to leave to go to a friend's house in Rolling Meadows to have some cocaine and relax. They did that, and Paul and Dawn left from there about 45 minutes later. Waldron continued to use cocaine; the defendant went to sleep for several hours.

At about 5 or 6 p.m., the defendant and Waldron sought out a friend of the defendant's, Art Holtin, in order to secure some .44 caliber bullets. According to the defendant, Waldron wanted the chamber filled with live bullets in case the police caught up with them. They went to Holtin's house and got both .44 and .22 caliber bullets.

Several other stops later, the defendant and Waldron left the trailer of a friend of Waldron's and went to a bar called J.J. Twigs in Lake Zurich, which Waldron said he wanted to rob. According to witnesses at Waldron's death penalty hearing, the defendant entered the bar first at about 1 a.m. He asked for cigarettes and change and then "checked the place out." Waldron then entered, and he and the defendant exited the bar. About five minutes later, a bar employee, Robert Haupt, exited. He saw the two men against the wall, and Waldron pointed a gun at him, saying he wanted to see some identification. Waldron was pretending to be a drug enforcement agent.

Waldron then told Haupt to get up against the wall. Waldron thumbed through Haupt's wallet, took $75 then threw it into the parking lot. Waldron then searched Haupt as a bar patron, Jessie Mayfield, and the bartender, James Arden, came out. After taking their wallets also, Waldron pointed his gun at the ground. It went off and flew out of his hand. The gun landed on the ground, and the defendant said, "If anyone would like to go for it, feel free." The defendant also had a gun.

Waldron then pretended to find drugs on Jessie Mayfield and proceeded to beat and kick him. According to bartender Arden, both men struck Mayfield with their feet and guns and then the defendant said that it was "enough." According to Haupt, the defendant intervened when Waldron began beating Mayfield and said: "Don't do anything to him, he's only a kid." Waldron then stopped beating Mayfield and began arguing with the defendant. Acting on an anonymous tip, the police were waiting at the trailer court when Waldron and the defendant returned from J.J. Twigs and arrested them.

The defendant's sentencing hearing was held June 30, 1989. The judge announced he had in his possession defendant's presentence investigation report, including a previous Cook County juvenile court social investigation of the defendant. He also had a three-page report from the Lighthouse Counseling Associates and a 21-page report from David Randall, a sentencing consultant. The judge took judicial notice of the trial and sentencing proceedings against John Waldron insofar as they were relevant to the defendant. The judge noted that there were some factors in the testimony at Waldron's trial which he would consider to be mitigating factors in sentencing the defendant, namely, that at least one witness said that the defendant did not have his gun out at the Speedway station until Steve Fuessle came out from the back room, and that the defendant appeared nervous throughout the robbery. The judge also stated he would consider as a mitigating circumstance that during the J.J. Twigs' robbery, the defendant got between Waldron and Jessie Mayfield and "seemed to be of an intent and mind to avoid people getting killed."

The presentence investigation report revealed that the defendant was 20 years old at the time of the offenses. He had juvenile adjudications for theft, attempted armed robbery and trespass, and adult convictions for battery, resisting a peace officer, aggravated battery, criminal damage to property, and criminal trespass to land.

The defendant's father drank heavily and severely physically abused the defendant from early on in the defendant's childhood. Defendant's father's recent stroke at age 43 caused his father to give

up drinking and smoking and, allegedly, marijuana. The defendant's maternal uncles were reported to be heavy drinkers and his maternal grandfather is a recovering alcoholic. The defendant's great-grandmother reportedly was an alcoholic prior to her death by suicide.

After a particularly harsh beating by his father, the defendant was placed in a temporary foster home by the Illinois Department of Children and Family Services (DCFS) and was made a ward of the State at age nine. In his early teens, he was placed initially in Sunny Ridge Family Center through DCFS, where he made little improvement. He then entered the Uhlich Children's Home Temporary Care Haven program, where he did well, adjusting satisfactorily to the program and relating well to both his peers and the supervisors of the program. He was then placed in the Allendale School for Boys, where he did very well, making vast improvements both academically and behaviorally and where he made friendships with staff members, one of whom visited the defendant even after he left Allendale. The defendant's employment history was sporadic. Shortly before the instant offenses, he worked in landscaping.

Dr. Walter McDonald testified that he was a clinical psychologist at Lighthouse Counseling Associates. He evaluated the defendant for purposes of sentencing after reviewing the police reports, the presentence investigation report, David Randall's report and reports concerning the defendant's former institutionalizations. McDonald testified that the defendant exhibited a combination of early and continuing patterns of severe physical abuse and introduction to alcohol (between the ages of eight and nine) and drugs (using marijuana at age seven) which resulted in addiction plus violent behavior which was aggravated by indulgence in alcohol. It was known that the defendant had accumulated at least one-half dozen charges for battery and aggravated battery. McDonald did not believe that the defendant was a psychopath or a sociopath but that he was an alcoholic who had violent patterns triggered in him when under the influence of drugs or alcohol. McDonald believed the defendant had a chance at rehabilitation with the condition that he totally abstain from both alcohol and drugs.

Kim Hall, the defendant's girlfriend for three years, testified to the defendant's good character and basically caring nature. She related how he helped her family around the house at a time when he did not have a job and how he chased a purse snatcher one time in order to retrieve a stranger's purse. She testified he was a hard worker and related how he undertook a major landscaping project for her girlfriend's mother. She acknowledged that her relationship with

the defendant was erratic, and that their relationship ended about five months before the instant offenses because of the defendant's continued drug use. She also acknowledged the defendant was arrested after their breakup for criminal trespass to land and criminal damage to property for breaking down the screen door of her house.

It was stipulated at the sentencing hearing that there was testimony during the Waldron proceedings that when the defendant and Waldron were at Arthur Holtin's house (where they obtained bullets for the guns after the homicide but before the J.J. Twigs' armed robbery), the defendant tried to get away from Waldron but Waldron stayed with him and even followed him into the bathroom.

David Randall, a psychosocial sentencing consultant, testified that the defendant was an alcoholic. According to Randall, the defendant's alcohol and substance abuse problems were never dealt with in his early placements outside his home. In Randall's opinion, a large part of the defendant's problems stemmed from his parents' premature removal of him from the Allendale school, where he had made significant progress. The removal was against both medical advice and the defendant's wishes. Randall testified that the defendant seemed to be a person who had a good core which might be tapped into and who was, despite all his hardships, able to form real emotional bonds with people. Randall believed that the goodness at the core of defendant's personality, combined with drug and alcohol treatment, gave him rehabilitative potential.

The defendant testified at the hearing. He acknowledged that he had testified at the trial of John Waldron. He related how he met Waldron at a local bar 8 to 10 days prior to the shooting and agreed to be Waldron's bodyguard. During the next 8 to 10 days, they drank alcohol and ingested between one-eighth and one-fourth of an ounce of cocaine per day. The defendant stated he never carried a gun before the shooting.

The defendant said that he was shocked and scared when Waldron shot Thomas Goings at the Speedway station and that he did not know what to do. Back at Paul Eshom's and Dawn Milne's apartment after the shooting, he saw Waldron put the money and his gun on the table. The defendant stated he then also put his gun on the table, and testified that he was thinking then that he had to get away from his companion. He also testified he did not want to accompany Waldron to Island Lake later that day, but that Waldron insisted. Waldron had a .44 caliber gun so the defendant felt he could not just knock Waldron out.

When Waldron told him that they were going to J.J. Twigs to rob it, the defendant said he did not at first agree, but Waldron "sort of talked [him] into it," and the defendant figured that he had no choice. It was Waldron's idea to stop patrons as they exited the bar and take their wallets. He could tell that Waldron wanted to shoot someone, and he eventually had to hold Waldron off at gunpoint and give people their car keys back. Eventually, defendant explained, he gave Waldron his gun back. When the court inquired why the defendant did not leave Waldron while he had both guns in his possession, the defendant said that he had no choice and that he would either have to shoot Waldron or give him the gun.

The defendant stated that he had been "hanging out in bars" for a couple of years because he was an alcoholic. Although he attended alcohol and drug abuse classes while he was incarcerated, he was unable to finish them because he was placed in maximum security. The defendant explained that he once was arrested for armed robbery (he was armed with a knife) and was placed on probation. His probation was then revoked as a result of him getting into a fight with several men from whom he had received stolen goods which he sold. When the men were apprehended, they tried to say the goods were stolen by the defendant.

The defendant stated he planned to deal with his substance abuse problem by attending Alcoholics Anonymous and Narcotics Anonymous meetings and taking advantage of all services and counseling offered to him and by learning a trade. In allocution, the defendant expressed his sorrow that Thomas Goings was shot and that he was ever involved in a situation that would lead to that. He reiterated that he intended to receive alcohol and drug counselling and do everything he could to conquer those problems so that nothing like this would ever happen again.

In argument at the sentencing hearing, the prosecutor noted that extended terms and consecutive sentences were dispositions available to the court. He declined to make a specific sentencing recommendation, however, and acknowledged several factors in mitigation which were present in this case. Specifically, he noted the physical abuse the defendant suffered as a child; his alcohol and drug addiction; his nervousness during the Speedway robbery and the fact he did not have his gun out until after the shooting occurred; the fact he stopped Waldron's beating of Jessie Mayfield at J.J. Twigs; and the fact that he provided truthful testimony at Waldron's trial.

Echoing those same mitigating factors, defense counsel also argued that Waldron was the most culpable because he acted completely

on his own in shooting Thomas Goings and in beating Jessie Mayfield during the J.J. Twigs' robbery. Counsel noted that Paul Eshom, who was older than the defendant and who had been acquainted with Waldron for a much longer time than the defendant, received only a 20-year sentence for his conviction for first degree murder in the Speedway homicide. Counsel also noted the several witnesses who spoke to the defendant's basically good character and caring nature, and he commented on the fact that both expert witnesses gave favorable opinions as to the defendant's rehabilitative potential. Counsel felt that defendant's age, his positive performance during his time at Allendale and his ability to maintain significant relationships all indicated he had rehabilitative potential. Counsel pointed out the defendant's prior criminal offenses were alcohol and drug related and involved physical abuse rather than dishonesty crimes such as burglary and theft. Considering the defendant's prior criminal history and his part in the instant offenses, counsel found it incongruous, in a redeeming sort of way, that the defendant's tattoo was of Garfield, the cartoon cat. Counsel suggested that if the defendant received a 40-year sentence and received day-for-day, good-time credit, he would be in his 40s when released from prison. At that time, he will have had the benefit of drug and alcohol treatment and will have an understanding of accountability and punishment.

Before pronouncing sentence, the judge stated he considered the factual basis of the defendant's guilty plea and the agreements and stipulations thereof in addition to the evidence adduced at Waldron's trial and sentencing hearing, the evidence presented at the defendant's sentencing hearing, the presentence investigation report, and arguments of counsel. He also considered that the defendant had made an important first step toward rehabilitation by pleading guilty, and he believed the defendant testified truthfully at the proceedings against Waldron. With regard to the defendant's background, the judge stated:

> "And there are mitigating factors as far as his background is concerned, although they're not excuses or reasons, and never sufficient, for his behavior, or his participation in this offense. People have a responsibility not only [to], in essence, say no to the use of drugs, but when people say, 'let's do an armed robbery,' I mean it goes without question."

Notwithstanding the fact the defendant testified he was "uncomfortable" with the shooting situation, the judge stated he believed that the defendant had the ability to get away from Waldron if he truly wanted to do so. He considered defendant's prior criminal activi-

ties and the likelihood of rehabilitation inasmuch as he did not view the defendant as some maniacal type of personality. The judge found to be a serious factor in aggravation the fact that the defendant was on felony probation when he committed the instant offenses. The judge acknowledged the applicability of consecutive sentences, but he did not consider same in light of the defendant's plea to the offenses and the fact that he perhaps saved Jessie Mayfield's life during the J.J. Twigs armed robbery.

In sentencing the defendant to 60 years for first degree murder and 20 years for armed robbery, the trial judge made the following remarks:

> "Because of his plea of guilty, because of his age, because of his actions, both, in giving truthful testimony in the Waldron trial and, most particularly, his actions which surely show that he wanted to protect 'em, didn't want people killed, and would actually take steps towards it, what I have decided is an appropriate sentence as far as this young man is concerned, is that due to his prior record of criminality, due to the fact that this is a part of an armed robbery, where someone was, in fact, killed, the fact that he was armed during that armed robbery, brandished a weapon towards other persons, that the type of sentence suggested by the defense is inappropriate. The legislature has a basic range for the offense of murder from 20 to 60 years in the penitentiary.
>
> It's the judgment of this court that for the offense of murder, he is sentenced to 60 years in the Illinois Department of Corrections. It's the further judgment of this court that for the offense of armed robbery, he is sentenced to 20 years in the Illinois Department of Corrections. That those sentences will run concurrently."

■■ As noted above, the defendant's subsequent motions for reconsideration of the sentences were denied. Those motions included as grounds for reconsideration each of the issues raised here save for the issue concerning aggravating factors inherent in the offenses themselves. Ordinarily, because the trial court had no opportunity to consider and rule on that issue in accordance with the spirit of Supreme Court Rule 604(d) (134 Ill. 2d R. 604(d)), we would consider the defendant's contention as to that issue to be waived. (*People v. Carroll* (1990), 195 Ill. App. 3d 445; *People v. Favelli* (1988), 176 Ill. App. 3d 618, 622-23.) However, inasmuch as the error affects the defendant's fundamental right to liberty and potentially infringes on his right not to be sentenced based on improper factors (*People v. Martin*

(1988), 119 Ill. 2d 453), we will address the merits of the issue in turn.

The defendant first contends his 60-year murder sentence should be reduced because the trial judge failed to give appropriate weight to mitigating factors and his rehabilitative potential. As a factor in mitigation, he points specifically to his history of alcoholism and drug abuse which began in his childhood and may have been genetically predisposed; the 8- to 10-day cocaine and alcohol binge he engaged in with Waldron just prior to the offense; the fact that his entire juvenile and adult criminal record is alcohol and drug related, and the fact that he played a secondary rather than primary role in the offense. As evidence of his rehabilitative potential, he points to his favorable tenure at the Uhlich Children's Home and the Allendale School of Boys, where he worked his way up to the Honors Cottage program and had good relations with both adult supervisors and his schoolmates; the testimony of two sentencing consultants that he had rehabilitative potential; the successful purse-snatcher chase incident undertaken on behalf of a stranger; and the fact that once he recognized the unprovoked violence Waldron was capable of inflicting, he acted to minimize the opportunities for it by telling Steve Fuessle at the Speedway station to get down on the floor and by stepping in and stopping Waldron's beating of Jessie Mayfield at J.J. Twigs.

■ This court's power to reduce a sentence pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) is limited to those cases in which a trial court has abused its discretion in imposing sentence. (*People v. Streit* (1991), 142 Ill. 2d 13, 19; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154; *People v. Jenkins* (1991), 209 Ill. App. 3d 249, 263.) Before this court will interfere with the sentence imposed, it must be manifest from the record that the sentence is excessive and not justified under any reasonable view which might be taken of the record. *People v. Williams* (1970), 130 Ill. App. 2d 192, 199-200; *People v. Glasgow* (1970), 126 Ill. App. 2d 82, 90.

Pursuant to the Illinois Constitution, penalties are to be determined according to the seriousness of the offense and with the objective of restoring the offender to his full citizenship. (Ill. Const. 1970, art. I, §11; *People v. Nelson* (1982), 106 Ill. App. 3d 838.) The trial judge is in the best position to fashion a sentence which balances both the need to protect society and to rehabilitate the offender (*People v. Rosa* (1982), 111 Ill. App. 3d 384) inasmuch as he has had the opportunity to observe the defendant in person and can better assess his credibility, demeanor, general moral character, mentality, environment, habits and age (*Streit*, 142 Ill. 2d at 19; *Perruquet*, 68 Ill. 2d at

154), along with a consideration of such other factors as his prior criminal history, rehabilitative potential, the seriousness of the offense, and the need to protect society and to deter others. *People v. Goodwin* (1991), 208 Ill. App. 3d 829, 831.

■ The existence of mitigating factors does not automatically oblige the trial court to reduce a sentence from the maximum sentence allowed (*People v. Powell* (1987), 159 Ill. App. 3d 1005, 1011), and where mitigation evidence is before the court, it is presumed the court considered that evidence absent some contrary indication other than the sentence imposed. *People v. Willis* (1991), 210 Ill. App. 3d 379, 389-90; *People v. Burke* (1987), 164 Ill. App. 3d 889; *People v. Ulmer* (1987), 158 Ill. App. 3d 148.

■ As a result of his convictions for first degree murder and armed robbery, and considering also his recent prior felony conviction for aggravated battery, the defendant faced a 20- to 60-year term for murder, with the possibility of an extended term of 60 to 100 years, which could be ordered to be served consecutively to the sentence imposed for armed robbery. (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—1(a)(1)(a), 1005—8—2, 1005—5—3.2(b)(1), 1005—8—4.) Other than the length of the sentence imposed, the defendant points to nothing in the record which would serve to rebut the presumption that the trial judge considered all of the mitigating evidence presented. Accordingly, the presumption remains intact.

Notably, the record of the hearing on the defendant's motions for reconsideration shows that the judge had originally indicated to the defendant during plea negotiations that he was considering a possible 70- to 90-year extended term. However, the judge stated at the reconsideration hearing that all of the evidence received at the sentencing hearing, and specifically the defendant's drug involvement, "made me keep it from being extended or being consecutive." Consequently, we may not only presume that the judge considered the mitigating evidence presented, but the record affirmatively shows that he considered the fact of the defendant's drug involvement in deciding to impose a 60-year term rather than a 70- or 90-year one.

■ Although not specifically one of the statutorily mandated mitigating factors to be considered, the fact that a defendant is and has been an alcoholic for a number of years was considered in *People v. Walcher* (1969), 42 Ill. 2d 159, 166-67, to be a circumstance which may be considered in determining punishment, and, in that case, the court reduced the defendant's death sentence to a term of not less than 40 nor more than 65 years. Similarly, drug addiction, also not a statutorily mandated mitigating factor, may be considered as such in appro-

priate cases. (See *People v. Whealon* (1989), 185 Ill. App. 3d 570, 573; *People v. Downey* (1987), 162 Ill. App. 3d 322, 338; *People v. Treadway* (1985), 138 Ill. App. 3d 899, 904-05.) Where a trial judge considers a defendant's drug addiction, but nonetheless decides that the addiction, if proved, does not entitle the defendant to lenient treatment, it cannot be said that an abuse of discretion has occurred. *Whealon*, 185 Ill. App. 3d at 573; *Downey*, 162 Ill. App. 3d at 338; *People v. Bartay* (1986), 150 Ill. App. 3d 130, 132-33.

As we read the record, any mitigating value to be afforded the defendant's unfortunate history of early alcohol and drug addiction was encompassed by the court's already considerable concessions in not extending the term or ordering it be served consecutive to the armed robbery sentence. In *Treadway*, we reduced the defendant's attempted murder and armed violence sentences from 60 to 30 years in part because the crimes were "perpetrated in a fleeting moment of intoxicated rage upon a stranger." (*Treadway*, 138 Ill. App. 3d at 905.) In contrast, we see no evidence here that the defendant's alcohol or drug usage affected him in such a way as to have contributed to his commission of the offense. He testified at Waldron's trial, in fact, that the cocaine made him feel alert; that he knew what he was doing the morning of the murder, he did not feel tired, the cocaine "overruled" the need to sleep, and he suffered no withdrawal symptoms after he was placed in the Lake County jail. There was evidence also that the defendant drank alcohol during the hours preceding the murder, but there is no evidence he was intoxicated as a result.

As such, it does not appear that the circumstances of the defendant's alcohol and drug addiction fell within the mitigating circumstance that "there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense" (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.1(a)(4)) or any of the other statutory mitigating factors. We agree with the *Whealon* court's sentiment that a defendant's drug addiction, in fact, could be considered an aggravating factor. (*Whealon*, 185 Ill. App. 3d at 574.) Depending on the substance abused, a defendant's drug addiction may be considered to be evidence of prior criminal activity (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(a)(3)), and such addiction would tend to refute the mitigating factors that the defendant has no prior history of criminal activity, that his conduct was the result of circumstances unlikely to recur, that his character and attitude indicate that he is unlikely to commit another crime, or that he is likely to comply with the terms of the period of probation. Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.1(a)(7) through (a)(10).

We conclude the court gave appropriate weight to the mitigating factors in evidence.

■ Insofar as the defendant's rehabilitative potential is concerned, it is well settled that a court is not required to give a defendant's rehabilitative potential more weight in its sentencing decision than it gives the seriousness of an offense. (*People v. Tatum* (1989), 181 Ill. App. 3d 821.) Before this court will modify the sentence, "it must appear to the reviewing court that the punishment clearly departs from the spirit and purpose of fundamental law, and the requirement of our constitution that the sentence be proportionate to the nature of the offense and measure the possibilities for rehabilitation." *Treadway*, 138 Ill. App. 3d at 904.

It is clear there was evidence tending to show that the defendant had rehabilitative potential. There was also evidence which tended to negate it. The court commented it specifically considered the defendant's commission of the instant offenses while he was on felony probation to be a significant factor in aggravation. It also firmly believed that the defendant had the opportunity to get away from Waldron if he had truly wanted to do so. The court also heard evidence that the defendant had never acknowledged until he was incarcerated that he had a drinking problem. Although the defendant participated in alcohol and drug abuse classes until he was placed in maximum security and was no longer able to, the Lighthouse Counseling Associates' report shows the defendant himself had doubts about his ability to conquer his alcohol addiction when he commented, "I can't see not drinking the rest of my life," and "I gotta stop drinking, but I don't think I can." The court also heard evidence of the defendant's susceptibility to negative—as well as positive—peer pressures; he behaves the way others expect him to behave.

It is evident the court grappled with the knot that confounds all sentencing decisions: How long is long enough? In a dialogue with the judge during the sentencing hearing, consultant David Randall agreed with the court that, considering the penitentiary system "is not particularly rehabilitative resource oriented" and that drugs may still be available to the defendant even while he is incarcerated, there was a possibility that the defendant's problems would not get better. However, considering also that the tendency to commit crimes decreases with age, that antisocial personality types usually burnout in their 40s, that the defendant had finally realized at least that maybe it would be a good idea if he did not drink, and that many people who had had contact with the defendant had "been able to hook in for whatever period of time into [the] goodness" at the defendant's core,

Randall stated: "I think that after a sufficiently long sentence \*\*\*, he'll get enough treatment in prison, will get into a program, the AA program, where he will develop an abstinence approach, something that will—he'll be there long enough for such treatment to take hold, and I think that he has rehabilitative potential."

■ The "sufficiently long" sentence chosen by the court was 60 years. Assuming day-for-day good time credit, the defendant would be just into his 50s when released. The defendant points to nothing in the record other than the length of the sentence imposed to rebut the presumption that the court considered the evidence of his rehabilitative potential. It is apparent the court was particularly cognizant of its duty to assess the defendant's rehabilitative potential in fashioning the correct sentence for this grave offense. We believe it gave appropriate weight to *all* the evidence of the defendant's rehabilitative potential, both positive and negative, in arriving at its decision.

■ Defendant contends that his sentence is greatly disparate to Paul Eshom's 20-year sentence and both have equal culpability. Sentencing disparity occurs when equally culpable defendants who have like backgrounds are given substantially different sentences or when equally culpable defendants with different backgrounds, ages, and criminal propensities are given the same sentence. (*People v. Stambor* (1975), 33 Ill. App. 3d 324, 326.) A disparity between codefendants' sentences is justified and will not be disturbed if the disparity is warranted by differences in the nature and extent of each defendant's participation in the offenses or by the history and character of the defendants. *People v. Godinez* (1982), 91 Ill. 2d 47, 55; *People v. Foster* (1990), 199 Ill. App. 3d 372, 393; *People v. Dubuisson* (1985), 136 Ill. App. 3d 305, 308; *Stambor*, 33 Ill. App. 3d at 326.

■ Even if we were to undertake analysis of whether the defendant's 60-year sentence was disparate from Paul Eshom's 20-year sentence, no meaningful comparison of the history and character of the codefendants could be undertaken inasmuch as the record does not include a copy of Paul Eshom's presentence report or the other documents received at his sentencing hearing. Thus, any doubts arising from that particular incompleteness of the record must be resolved against the defendant. *People v. Foster* (1990), 199 Ill. App. 3d 372, 393.

■ Based on the record we do have, which includes a transcript of Eshom's brief sentencing hearing, we know that Eshom and the defendant each played secondary roles in the Speedway armed robbery, and neither one knew that Waldron would shoot someone. We perceive, as the trial judge clearly did also, a decided qualitative dif-

ference between those secondary roles: Eshom supplied the equipment necessary to facilitate the armed robbery, but the defendant actually went into the station to commit it. Further, rather than subsequently disengaging himself from the company of Waldron as Eshom did, however, the defendant proceeded with Waldron to commit another armed robbery less than 24 hours later and was arrested. Eshom, on the other hand, turned himself in—twice, in fact—for his part in the felony murder and he had no prior criminal record save for disorderly conduct in Colorado years ago. Beyond Eshom's use of cocaine just before and after the felony murder, there is no evidence of his use of drugs. At a minimum, these factors indicate a difference in character and rehabilitative potential which justifies a disparity.

　　■■ Finally, the defendant contends the trial court improperly considered aggravating factors already inherent in the felony murder and armed robbery offenses. The defendant argues the following comments of the trial judge at sentencing show the error:

> "[W]hat I have decided is an appropriate sentence as far as this young man is concerned, is that due to his prior record of criminality, *due to the fact that this is part of an armed robbery, where someone was, in fact, killed, the fact that he was armed during that armed robbery, brandished a weapon towards other persons*, that the type of sentence suggested by the defense is inappropriate." (Emphasis added.)

Defendant argues that being armed and brandishing a weapon are factors necessarily inherent in any armed robbery and the loss of life is inherent in every murder. As such, those factors may not be used to enhance the sentence (*People v. Saldivar* (1986), 113 Ill. 2d 256; *People v. Conover* (1981), 84 Ill. 2d 400), since the legislature would already have taken them into account when it established penalties for the crimes (*People v. Martin* (1988), 119 Ill. 2d 453, 459-60; *Conover*, 84 Ill. 2d at 405). Citing *People v. Bone* (1982), 103 Ill. App. 3d 1066, the State argues that because at least one of the witnesses testified that one of the armed robbery victims was kicked and beaten by the defendant with his hands and weapon, it was proper for the court to consider the threat of serious harm as an aggravating factor in sentencing him on the armed robbery count. Alternatively, the State argues resentencing is not necessary where the trial judge obviously did not place great weight on the fact that the defendant's conduct caused or threatened serious bodily harm.

As we read the court's remarks concerning armed robbery, they refer only to the felony murder offense and not the armed robbery at

J.J. Twigs. Consequently, we reject the State's argument in that regard and find *People v. Bone* inapposite.

One of the statutory factors in aggravation that the sentencing judge may consider is that "the defendant's conduct caused or threatened serious harm." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(a)(1).) All felony murders include the element that a forcible felony is being attempted or committed. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3).) A "forcible felony" includes, *inter alia*, robbery "and any other felony which involves the use or threat of physical force or violence against any individual." (Ill. Rev. Stat. 1989, ch. 38, par. 2—8.) We find it was not improper for the court to take into account the specific nature of the forcible felony committed by the defendant as a factor in aggravation. However, we believe the judge's comment that "someone was, in fact, killed" shows he improperly considered the fact of the victim's demise in aggravation of the defendant's sentence where the fact that a death occurred is implicit in every felony murder. Consideration of an improper aggravating factor requires remand for resentencing only where we are unable to determine the weight given to the improper factor. (*People v. Bourke* (1983), 96 Ill. 2d 327, 332; *People v. Green* (1991), 209 Ill. App. 3d 233, 248.) Taking the court's sentencing comments in their entirety, we do not believe its reference to the fact of the victim's death was a significant factor in the length of sentence imposed.

For the reasons expressed above, the judgment of the circuit court of Lake County in appeal No. 2—89—0697 (first degree murder) sentencing the defendant to a 60-year term in the Department of Corrections is affirmed. The judgment of the circuit court of Lake County in appeal No. 2—89—0698 (armed robbery) is affirmed.

No. 2—89—0697, Judgment affirmed.
No. 2—89—0698, Judgment affirmed.

REINHARD, P.J., and DUNN, J., concur.