Walter STEWART, Petitioner–Appellant,

v.

Richard B. GRAMLEY, Warden, Pontiac Correctional Center, et al., Respondents–Appellees.

No. 95–1850.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 21, 1995.

Decided Jan. 9, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 27, 1996.

David C. Thomas (argued), Chicago–Kent College Of Law, Chicago, IL, Marshall Hartman, Capital Resource Center, Chicago, IL, for Walter Stewart.

Steven J. Zick, Office of Attorney General, Criminal Appeals Division, Chicago, IL, Kevin Sweeney, Renee G. Goldfarb (argued), Office of State's Attorney of Cook County, Criminal Appeals Division, Chicago, IL, for Richard B. Gramley and James E. Ryan.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

POSNER, Chief Judge.

Walter Stewart entered a jewelry store in an Illinois town, drew a revolver, and announced a stickup. After completing the stickup, Stewart ordered the three people (the woman who owned the store, her boyfriend, and her brother) who were in the front of the store (a fourth had slipped away to a back room) to move to the side. The men didn't move; the woman did move, but she took a step backward rather than to the side and Stewart shot her. The two men jumped Stewart, who fired four times, hitting both men. They fell to the floor, and Stewart shot one of them again. He then raced to the back room, pointed his gun at the woman there, and pulled the trigger. Nothing happened, as he had run out of bullets. He fled, and was arrested outside the store. Both the men he had shot were dead. The woman who was shot survived and identified Stewart at a lineup. When she cried, "You killed my brother," he replied, "So what. It should have been your mother."

The robbery and murders occurred in 1980, and later that year Stewart pleaded guilty and, after a hearing, was sentenced to death. After exhausting his state appellate and postconviction remedies, Stewart turned to federal court, where at first he was successful. The district judge held that Stewart's guilty plea had been involuntary. We reversed. *Stewart v. Peters*, 958 F.2d 1379 (7th Cir.1992). The district judge had not ruled on all of Stewart's claims, so the case went back to him. On remand, the judge rejected the remaining claims and denied relief, precipitating this second appeal.

Some of the grounds presented by the appeal are either foreclosed by previous decisions of this court or manifestly without merit. Only three grounds require discussion. The first is that the trial judge should have complied with the request of Stewart's lawyers that a psychiatrist be appointed to

examine Stewart and determine whether he might have a psychiatric condition that would mitigate his guilt and by doing so perhaps persuade the judge not to impose the death sentence. The decision that established the right to such an appointment, *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), came after Stewart's conviction and sentence became final, and thus cannot be used as a ground for relief in a federal habeas corpus proceeding. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Stewart argues that *Ake* did not create the right to a court-ordered psychiatric examination but instead merely applied existing law that recognized the right's existence. The argument is based on generalities in earlier opinions to the effect that a death sentence to be valid must be based on reliable evidence. That is a broad principle and out of it the Court evolved the specific right involved in *Ake.* All procedural rights of criminal defendants evolve out of principles as old as the Constitution and often much older. *Teague v. Lane* would have no domain of application if limited to cases in which the Court had created a right that had no antecedents in the traditions of Anglo–American criminal procedure.

■ Even if Stewart were entitled to rely on *Ake,* which he is not, the failure to appoint a psychiatrist to examine Stewart could not have been a prejudicial error. We know this because beginning a few months after his conviction and continuing for at least eight years (perhaps longer, but the part of the appellate record that is relevant to this issue stops in 1988), Stewart underwent numerous psychiatric examinations. Some were routine, others in response to complaints he made about nervousness or sleeplessness. Although there are scattered conjectures about the possibility that Stewart might have a "paranoid personality," "borderline personality disorder," or "anti-social personality disorder," there is no reliable indication of any psychiatric disorder graver than "situational anxiety, mild." Obviously a person under sentence of death—*unless* he is insane—is going to exhibit some "situational anxiety." We can find no persuasive evidence of any psychiatric condition that might have been present before Stewart was sentenced to

death and no reason to believe that his chances of escaping the death penalty would have been materially enhanced had he been examined ·by a court-appointed psychiatrist in preparation for the sentencing hearing.

■ One of the aggravating factors on which the judge relied in sentencing Stewart to death was Stewart's record of convictions before he held up the jewelry store. That record consisted of nine separate convictions for offenses ranging from theft to armed robbery. Two of the "convictions," one for robbery and one for theft, turn out not to have been formal convictions but instead orders of supervision. Under Illinois law, a judge who finds a defendant guilty of a crime (whether pursuant to a plea of guilty or after a contest) can, in lieu of entering a formal judgment, place the defendant on supervision for a period and if he completes the period without incident then he is discharged and there is no conviction on his record. 730 ILCS 5/5–6–3.1(f). For purposes of determining a defendant's criminal history in a death-penalty hearing, however, the distinction between conviction and supervision is irrelevant. Just like a judgment of conviction, an order of supervision requires a finding of guilt. The only difference is in the punishment, when "punishment" is realistically defined to include the effect on one's employment and other prospects of having a formal record of having been convicted of a crime. An order of supervision is a more lenient penalty even than probation. The statutory provision that makes a defendant's criminal history a basis for finding circumstances of aggravation that might warrant a death sentence does not limit the history that may be considered to formal convictions any more than it does to convictions that result in a sentence lighter, perhaps much lighter, than imprisonment. The provision refers only to "history of prior criminal activity." 720 ILCS 5/9–1(c)(1). *People v. Johnson,* 128 Ill.2d 253, 131 Ill.Dec. 562, 576–77, 538 N.E.2d 1118, 1132–33 (1989), refused to carve an exception for sentences of supervision. See also *People v. Tinkham,* 266 Ill.App.3d 391, 203 Ill.Dec. 358, 363, 639 N.E.2d 917, 922 (1994).

The main issue on appeal is the competence of Stewart's original lawyers. He claims that they made an insufficient investigation of his personal history before the sentencing hearing and as a result were unable to present mitigating factors that might have dissuaded the judge from sentencing Stewart to death. The lawyers talked to Stewart, of course, but not to members of his family or to other potential witnesses. Members of his family and other witnesses did testify on his behalf at the sentencing hearing, but they had not been interviewed in advance. Although Stewart had told his probation officer that he had used drugs, and although his criminal history included a drug offense, the lawyers did not investigate the history of his drug use.

The question how extensive an investigation into the existence of potential mitigating factors a capital defendant's lawyers must conduct in order to discharge their duty of rendering professionally competent assistance is a difficult one. Mitigation is a vaguer concept than guilt. When the issue is guilt, defense counsel's duty of investigation is fairly well defined; counsel must (unless there is a strategic reason for not doing so) follow up leads provided by the client or others and in particular must interview potential witnesses likely to provide material evidence favorable to the defense. *Williams v. Washington*, 59 F.3d 673, 680–81 (7th Cir. 1995); *United States v. Shetterly*, 971 F.2d 67, 74 (7th Cir.1992); *Sullivan v. Fairman*, 819 F.2d 1382, 1391–92 (7th Cir.1987). What exactly counsel must do to determine the presence of factors mitigating the gravity of the defendant's conduct is less clear. The standard is clear enough—is in fact the same standard as that of effective assistance in the guilt phase of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 690–91, 695, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984); *Funchess v. Wainwright*, 772 F.2d 683, 688 (11th Cir.1985). The lawyer must make a "significant effort, based on reasonable investigation and logical argument," to mitigate his client's punishment. *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.1989). But what does this mean in practice? Presumably the lawyer is not required to investigate the defendant's past with the thoroughness of a biographer. The resources of defense lawyers are limited and they have only a short time to prepare for the sentencing hearing. Sometimes it will be apparent from the evidence concerning the circumstances of the crime, from conversation with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will repay further investigation, and then the failure to investigate will be ineffective assistance. *Brewer v. Aiken*, 935 F.2d 850, 857–58 (7th Cir.1991); *Antwine v. Delo*, 54 F.3d 1357, 1365–68 (8th Cir.1995). In other cases, where these indications are lacking, counsel may "reasonably surmise from his conversations with [the defendant] that character and psychological evidence would be of little help." *Strickland v. Washington, supra*, 466 U.S. at 698, 104 S.Ct. at 2070; see also *Waters v. Thomas*, 46 F.3d 1506, 1510–18 (11th Cir.1995) (en banc); *Bolender v. Singletary*, 16 F.3d 1547, 1557 (11th Cir.1994); *Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir.1990). If a "decision not to mount an all-out investigation ... [is] supported by reasonable professional judgment," it is not ineffective assistance. *Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 3125, 97 L.Ed.2d 638 (1987). See also *Sidebottom v. Delo*, 46 F.3d 744, 752–53 (8th Cir.1995). In this case, counsel's conversations with Stewart turned up nothing remarkable in his personal history and the fact that he may have used drugs would not by itself indicate the presence of a mitigating factor and might indeed point to the opposite. *Burger v. Kemp, supra*, 483 U.S. at 793, 107 S.Ct. at 3125; *James v. Butler*, 827 F.2d 1006, 1016–17 (5th Cir.1987); *People v. Smith*, 214 Ill.App.3d 327, 158 Ill. Dec. 671, 680, 574 N.E.2d 784, 793 (1991).

But we need not try to fix the outer bounds of the duty to investigate in preparation for a death-penalty hearing. The failure to conduct a fuller investigation in this case was not prejudicial; it is highly unlikely to have made the difference between a sentence of death and a lesser sentence. *Darden v. Wainwright*, 477 U.S. 168, 184–86, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1986); *Strickland v. Washington, supra*, 466 U.S. at 694, 104 S.Ct. at 2068; *Milone v. Camp*, 22 F.3d

693, 704 (7th Cir.1994). We know this because Stewart's current lawyers, whose competence and energy cannot be doubted, have conducted the investigation that they say their predecessors should have done and they have come up with nothing or perhaps less than nothing.

We are mindful of their suggestion (made only at the argument, and perhaps not intended) that *anything* which serves to amplify the personal history of the defendant and by doing so furnishes clues to the causality of the crime for which he has been sentenced to death makes such a sentence less likely to be imposed. Causality is mitigation, the lawyer argued. *Tout comprendre c'est tout pardonner.* It is not an absurd argument. It exploits the tension between belief in determinism and belief in free will. If the defendant's crime can be seen as the effect of a chain of causes for which the defendant cannot be thought responsible—his genes, his upbringing, his character as shaped by both, accidents of circumstance, and so forth—then a judge or jury is less likely to think it appropriate that he should receive a punishment designed to express society's condemnation of an evil person. We consider a rattlesnake dangerous but not evil. Maybe if we learned enough about Walter Stewart we would consider him a person who had no more control over his actions than a rattlesnake has over its actions.

But not everyone who believes that human actions are as much the consequences of causal factors as anything else in nature denies that man is "free" to refrain from "voluntary" acts such as murder and is therefore blameworthy if he does not. "Compatibilists" since Hume have argued that human action is both caused and, for purposes of ascribing moral and legal responsibility, free. We cannot resolve a philosophical debate. And need not. It is enough for our purposes that capital punishment is not premised on—indeed is inconsistent with—the view that the only reason we think that people act "voluntarily" is that we have not studied the antecedents of their actions carefully, and that the purpose of a death-penalty hearing is to investigate the defendant's history in sufficient depth to dispel the illusion that he was free not to commit the crimes for which he is being condemned. For then the sentence of death would be the proof that the lawyers had not done their job. And since it obviously is not the theory of capital punishment that murderers are compelled to murder by their past and therefore should not be punished, it cannot be right that anything brought out at a death-penalty hearing is certain or even likely to help the defendant to save his life. What is brought out that will help him is what goes to show that he is not as "bad" a person as one might have thought from the evidence in the guilt phase of the proceeding. What is brought out that will hurt him is what goes to show that he is, indeed, as bad a person, or worse, than one might have thought from just the evidence concerning the crime.

At the sentencing hearing members of Stewart's family and his former supervisor at work testified that he had been abandoned by his mother when he was an infant (he does not know who his father was) and had been brought up by his grandparents in Michigan. His grandmother died when he was 15. He had moved to Chicago with his grandfather a few years earlier. He was friendly, worked some and got along with his coworkers, and attended church regularly. Ten years after moving to Chicago he held up the jewelry store. Shortly before that his grandfather had died and Stewart had been distraught. In the closing argument at the sentencing hearing his lawyer did not mention Stewart's personal history although he had brought it out at the hearing through the testimony that we have just summarized.

The fruits of the investigation by Stewart's current lawyers are summarized in a report by a "mitigation specialist" backed up by affidavits. According to the report Stewart was born at home without the assistance of a doctor and fell on the floor on his head when he emerged from his mother's body. His mother was 19 years old and gave Stewart to her parents when he was six months old. She does not know the name of his father. She eventually moved in with her parents, so that she was living in the same house with Stewart, but she did not treat him as her son and displayed no affection for him. When

Stewart was 12 his grandfather, whom he doted on, had a mental breakdown. Stewart was a hyperactive child, did badly in school, and dropped out after the ninth grade. Coming from rural Michigan Stewart was not used to the gun-toting ways of his Chicago age-mates and imitated their behavior, which included carrying and using guns. At age 13 he fell under the influence of his cousin Geraldine, "a hustler who got her money through swindling people." Fagan-like, Geraldine used Stewart "as her apprentice and bodyguard." The affidavit of one of Stewart's sisters states that "Geraldine is the rotten egg of the family."

Stewart "was enthralled by Geraldine's lifestyle," and "turned increasingly to crime, primarily robberies." He began using drugs, and for a time was a heroin addict. Once, while under the influence of heroin (which, the "mitigation specialist" pointed out, can injure the brain), Stewart "beat Wanza [another one of his sisters] very badly and the police had to be called."

Much of this narrative is irrelevant, such as the circumstances of Stewart's birth, the fact that his grandfather had a mental breakdown, and the heroin addiction. The purpose of these details is to insinuate that Stewart may have brain damage, but of this there is absolutely no evidence and, inconsistently, the report urges as a mitigating factor that Stewart has been an excellent student in prison, obtaining his high-school degree and taking college courses besides, often getting A's in them. Cf. *Francis v. Dugger, supra*, 908 F.2d at 703. As for his falling among evil companions, it is obvious that one does not become a teenage robber without being initiated into criminal activity by older hands, not uncommonly a relative. As for drug abuse, the report does not suggest and there is no evidence that Stewart committed the robbery and murders while under the influence of any drug, or, as we have already noted, that he has any organic brain damage. That he comes from a broken home and was brought up in a poor, rough neighborhood of Chicago was known at the sentencing hearing although, we have said, it was not mentioned in his lawyer's closing argument. The report of the mitigation specialist adds colorful details possibly relevant under a *tout comprendre* defense if one existed, but not calculated to make a judge or jury think Stewart less deserving of the death penalty.

The mitigation specialist's reference to Stewart's having embarked on a criminal career consisting "primarily of robberies" after he met cousin Geraldine when he was 13 is highly relevant to appraising the likely impact of current counsel's thorough investigation on a sentencing judge. The criminal record that was put before the judge understated, we now know as a result of the investigation, Stewart's actual criminal history. Evidently the nine crimes of which he had been convicted (or sentenced to supervision) were only the tip of the iceberg. He had been a career criminal from the age of 13. This was, it appears, when he began to "use guns." The implication is that when he started on the robbery trail he used guns in his robberies, and recall that one of his convictions was for armed robbery—committed when he was only 14. The murders in the jewelry store were the predictable culmination of his criminal career. He was by then a hardened, dangerous, and seemingly inveterate criminal. Had Stewart's original lawyers conducted the thorough investigation that their successors have and presented the results to the judge, we would now be faced with an argument that they had pursued a hopelessly losing strategy for trying to ward off the death penalty. Maybe they should have looked harder, nonetheless, though we do not decide that question; but if they had looked harder, they would, it is now evident, have found little or nothing that would have been likely to sway the judge in Stewart's favor and much that might have swayed him against. They do not argue that it would have been ethical or feasible to have concealed from the judge the negative results of a thorough investigation.

AFFIRMED.