IN THE CASE OF

UNITED STATES, Appellant

v.

William J. KREUTZER Jr., Sergeant
U.S. Army, Appellee

No. 04-5006

Crim. App. No. 9601044

United States Court of Appeals for the Armed Forces

Argued December 8, 2004

Decided August 16, 2005

ERDMANN, J., delivered the opinion of the court, in which
GIERKE, C.J., and EFFRON and BAKER, JJ., joined.  CRAWFORD, J.,
filed a dissenting opinion.

Counsel

For Appellant:  Captain Edward E. Wiggers (argued); Colonel
Steven T. Salata, Lieutenant Colonel Mark L. Johnson, and Major
Natalie A. Kolb (on brief).

For Appellee:  Captain Charles A. Kuhfahl Jr. (argued); Colonel
Mark Cremin and Lieutenant Colonel Mark Tellitocci (on brief).


Military Judge:  Peter E. Brownback III


**This opinion is subject to revision before final publication.**

Judge ERDMANN delivered the opinion of the court.

Sergeant (SGT) William J. Kreutzer Jr. opened fire with an automatic weapon on personnel in his brigade when they were in formation commencing a unit run. He was subsequently charged with one specification of premeditated murder, eighteen specifications of attempted premeditated murder, one specification of violation of a lawful general regulation, one specification of larceny of Government munitions, four specifications of maiming, and eighteen specifications of aggravated assault, in violation of Articles 118, 80, 92, 121, 124, and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 880, 892, 921, 924, 928 (2000), respectively. The charges were referred to a general court-martial with instructions that the case was "[t]o be tried as a capital case."

Kreutzer pleaded guilty to one specification of murder while engaged in an act inherently dangerous to another (as a lesser included offense of premeditated murder), eighteen specifications of assault with a loaded firearm (as a lesser included offense of attempted premeditated murder), one specification of violating a lawful general regulation, and one specification of larceny of Government munitions. He was convicted of one specification of premeditated murder, eighteen

specifications of attempted premeditated murder, one specification of violating a lawful general regulation, and one specification of larceny of Government munitions.[1]  A unanimous twelve-member court of officer and enlisted members sentenced Kreutzer to death, a dishonorable discharge, forfeiture of all pay and allowances, and reduction to E-1.  The convening authority approved the sentence as adjudged.

The United States Army Court of Criminal Appeals affirmed only the findings to which Kreutzer had entered guilty pleas: murder while engaged in an inherently dangerous act; assault with a loaded firearm; violating a lawful general regulation; and larceny of Government munitions.  United States v. Kreutzer, 59 M.J. 773, 784 (A. Ct. Crim. App. 2004).  The Army court set aside the findings of guilty to premeditated murder and attempted premeditated murder and the sentence.  Id.  The Army court denied a Government request for en banc consideration and a motion for reconsideration.  Subsequently, the Judge Advocate General of the Army (TJAG) certified the case to this court pursuant to Article 67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2) (2000).

---

[1] At trial the charges of maiming and aggravated assault were consolidated with related specifications alleging attempted premeditated murder, and the maiming and aggravated assault offenses were "provisionally dismissed."

United States v. Kreutzer, No. 04-5006/AR

Compulsory process, equal access to evidence and witnesses, and the right to necessary expert assistance in presenting a defense are guaranteed to military accuseds through the Sixth Amendment, Article 46, UCMJ, 10 U.S.C. § 846 (2000), and Rule for Courts-Martial (R.C.M.) 703(d).  See Ake v. Oklahoma, 470 U.S. 68, 77 (1985).  The Court of Criminal Appeals found that Kreutzer was erroneously denied expert assistance in the form of a capital mitigation specialist.  Kreutzer, 59 M.J. at 775.  A majority of that court further found that the Government did not show that error to be harmless beyond a reasonable doubt with respect to the contested findings of premeditated murder and attempted premeditated murder.  Id.  The issue certified to us by TJAG asks us to determine whether the Court of Criminal Appeals erred in finding that the Government did not meet its burden of demonstrating that the erroneous denial of a mitigation specialist was harmless beyond a reasonable doubt.[2]

---

[2]  The certificate for review raises the following issue:

> WHETHER THE UNITED STATES ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT FOUND DENIAL OF A MITIGATION SPECIALIST TO BE PREJUDICIAL ERROR FOR FINDINGS WHEN THE SAME OPINION ALSO FOUND THAT ALL EVIDENCE THE MITIGATION SPECIALIST WOULD HAVE DISCOVERED DID NOT HAVE A REASONABLE PROBABILITY OF PRODUCING A DIFFERENT RESULT.

Although TJAG has not certified and the parties do not contest that the military judge erred in denying Kreutzer's request for expert assistance, this court could examine the military judge's legal ruling.  United States v. Simmons, 59 M.J. 485, 488 (C.A.A.F. 2004).  However, "we are

BACKGROUND

Sergeant Kreutzer enlisted in the U.S. Army and entered active duty in February 1992. In March of 1993 he was assigned to the 325th Airborne Infantry Regiment of the 82d Airborne Division,[3] stationed at Fort Bragg, North Carolina. Although Kreutzer was considered by some superiors to be a good soldier, throughout his military career he had trouble fitting in and interacting with his fellow troops. Kreutzer deployed to the Sinai with his unit in January 1994. The butt of numerous practical jokes and frequently referred to in derogatory terms, Kreutzer's tolerance for this chiding and his relations within

reluctant to exercise that power and, as a rule, reserve it only for those cases where the lower court's decision is 'clearly erroneous and would work a manifest injustice' if the parties were bound by it." Id. (quoting United States v. Doss, 57 M.J. 182, 185 (C.A.A.F. 2002)). The parties do not urge and the record does not suggest that the Army Court of Criminal Appeals' ruling is clearly erroneous or that it causes a manifest injustice. This case presents even stronger circumstances than Simmons for this court not to address the correctness of the military judge's ruling. Simmons involved a granted petition, but the present case is before this court on a single certified issue. The Judge Advocate General of the Army made a decision to certify a precise issue relating to the lower court's finding of prejudice. Despite the opportunity to bring the lower court's ruling before this court that the military judge erred in denying Kreutzer's request for a mitigation specialist, TJAG chose not to do so. Under these circumstances, we conclude that the lower court's ruling that the military judge erred in denying Appellee's request for expert assistance is the law of the case. See United States v. Grooters, 39 M.J. 269, 273 (C.M.A. 1994). Therefore, we do not review that ruling.

his unit deteriorated. From approximately April to July, 1994, Kreutzer began to make threats to kill including threats to kill named individuals, soldiers in physical training formation, and entire units while they slept. Kreutzer often described to others precisely how he planned to kill these individuals.

In June of 1994 Kreutzer broke down and cried while on guard duty and threatened to kill other members of his unit. Kreutzer was confronted about the threats by his platoon sergeant who escorted him to the division's mental health officer, Dr. (Captain) Darren Fong. Kreutzer met with Dr. Fong and discussed his homicidal thoughts about his squad members. Doctor Fong concluded that Kreutzer was a person who had problems with anger and low self-esteem and "appeared" to have interpersonal problems with members of his squad. Doctor Fong, however, felt that Kreutzer was not a danger to himself or others. Kreutzer remained with his unit where he continued to have difficulty interacting with other soldiers and also started to have performance problems that continued up to the time of the charged offenses. Despite his difficulties and apparent emotional problems, in October 1994, Kreutzer attended the Primary Leadership Development Course to become a

---

[3] The 325th Airborne Infantry Regiment is also known as the 2d Brigade of the 82d Airborne.

noncommissioned officer and he was promoted to sergeant in March 1995.

The 2d Brigade scheduled a unit run for the morning of October 27, 1995.[4]  On the evening of October 26, 1995, Kreutzer called Specialist Fourth Class (SP4) Mays, a member of his squad, and informed him that he was "going to shoot the run the following day."  Before the scheduled run on the morning of October 27, SP4 Mays informed his chain of command of Kreutzer's threat.  The platoon leader and platoon sergeant initially laughed when the threat was brought to their attention.  Similarly, the threats Kreutzer made to SP4 Mays were not taken seriously by the first sergeant or the acting company commander.

On the morning of October 27, 1995, Kreutzer secreted himself in the woods near an athletic field at Fort Bragg, North Carolina, where his brigade was forming for the run.  As the brigade marched out of the stadium, Kreutzer opened fire on the formation with two rifles.  Eighteen soldiers were wounded and one officer suffered a fatal wound in Kreutzer's attack.  Kreutzer was subdued by three Special Forces soldiers who had been running in the area.

---

[4] The 2d Brigade had just assumed the highest readiness posture in their readiness cycle.  It is standard practice for the brigade to hold a mission assumption run to recognize this status and the entire brigade task force participates. The brigade task force was composed of between 1,500 and 2,000 soldiers.

Kreutzer did not deny that he fired shots at his brigade from ambush or that he wounded eighteen soldiers and killed an officer. He later stated that his actions were intended to send a message that the unit did not care about the men. He also anticipated that he would either shoot himself or be shot and killed by the military police.

Subsequent to his apprehension and while still in law enforcement custody, Kreutzer was assessed by the 82d Airborne Division psychiatrist. He received additional mental health evaluation in the form of a suicide assessment while he was in pretrial confinement. Kreutzer was evaluated by a privately retained forensic psychiatrist in November 1995 and he was evaluated by a sanity board convened under R.C.M. 706 in December 1995. Charges against Kreutzer were referred to a capital general court-martial on January 24, 1996.

On March 11, 1996, Kreutzer's defense team filed a request with the convening authority for employment of a mitigation specialist. Although the convening authority did approve funding for defense counsel to travel in support of building a case in mitigation, he denied the request for a mitigation specialist. The defense renewed its request for a mitigation specialist by motion before the military judge.

Defense counsel provided a copy of the request they had made to the convening authority in which they asserted that they

lacked "the experience and scientific expertise to uncover all potentially mitigating events or factors in SGT Kreutzer's case." They also provided an extensive affidavit from a "mitigation specialist" that explained the necessity of a mitigation investigation in capital cases, the scope of that investigation, and the role of a mitigation specialist. Defense counsel argued that they were not qualified to do the work of a mitigation expert. The Court of Criminal Appeals reached the same conclusion stating, "[I]n determining whether or not the defense counsel could adequately do the function of an expert mitigation specialist, the judge should have considered, among other factors, defense counsel's lack of capital litigation experience, their minimal capital litigation training, and the time constraints they were facing at trial." Kreutzer, 59 M.J. at 778. The military judge denied the motion without entering any findings of fact by simply stating: "I find the law here at Loving 3 at 250. I don't find the showing requiring me to order one."[5]

---

[5] The military judge was referring to this court's decision in United States v. Loving, 41 M.J. 213 (C.A.A.F. 1994).

DISCUSSION

I.

Ruling of the U.S. Army Court of Criminal Appeals

Kreutzer appealed a number of issues to the Court of Criminal Appeals,[6] but the Army court addressed only two: "(1) whether the military judge erred by denying [Kreutzer] the services of an expert consultant in capital sentence mitigation, and (2) whether appellant's detailed trial defense counsel were ineffective in their representation of [Kreutzer] at the sentencing stage of trial." Id. at 775. The court unanimously agreed that the sentence must be set aside due to ineffective assistance of counsel, a determination that the Government has not appealed. A majority of the court found prejudicial error in the denial of the mitigation specialist and set aside the contested findings and sentence. The Government does not contest that the military judge erred in denying a mitigation specialist, but argues that the error was harmless beyond reasonable doubt for the following reasons: (a) the Court of Criminal Appeals erred in applying the test for harmless error; (b) the majority opinion impeached itself; and (c) the nature of the mental health evidence is not relevant to the element of

---

[6] Kreutzer's case was referred to the Army Court of Criminal Appeals on September 27, 1996. Thereafter, Kreutzer filed two briefs before the Army court. One was filed on March 9, 2001 and asserted twenty-one assignments of error. The other was

premeditation.  Following discussion of the Government's contentions in regard to the Army court's decision, we will address whether the Government met its burden in establishing that Kreutzer suffered no prejudice.

   a.  Did the Court of Criminal Appeals err in applying the test for harmless error?

   Arguments:

   The Government argues that the Court of Criminal Appeals erred in applying the test for harmless error in this case.  The Army court explained that the test for prejudice was whether the error was harmless beyond a reasonable doubt.  Kreutzer, 59 M.J. at 779 (citing Chapman v. California, 386 U.S. 18 (1967)), and went on to define that inquiry as "whether the error itself had substantial influence" on the trial results.  Id. (citing United States v. Pollard, 38 M.J. 41, 52 (C.M.A. 1993)).  The Government urges that Pollard requires a threshold determination that an error must be shown to "prejudice a litigant's substantial rights" before any burden to show harmlessness beyond a reasonable doubt is imposed on the Government.  38 M.J. at 52 (quoting Kotteakos v. United States, 328 U.S. 750, 760 (1946)).  The Government argues that Kreutzer did not meet this threshold showing of prejudice.

---

filed on February 12, 2002 and asserted another fifty-five assignments of error.

11

United States v. Kreutzer, No. 04-5006/AR

Kreutzer argues that the Court of Criminal Appeals used the correct standard in determining this error was not harmless.  In response to the Government's Pollard argument, Kreutzer argues that the Army court did find prejudice to his substantial rights and, alternatively, that the finding that the error was not harmless beyond a reasonable doubt created a de facto finding that the error prejudiced his substantial rights.  Finally Kreutzer points out that this is a case in which the test for harmlessness must be assessed by asking if even one member might have been influenced to conclude that the Government did not prove premeditation beyond a reasonable doubt.  Had even one member been so persuaded, death would have been removed as a lawful punishment in this case.

Discussion:

The right to the expert assistance of a mitigation specialist in a capital case is determined on a case-by-case basis.  See United States v. Loving, 41 M.J. 213, 250 (C.A.A.F. 1994).[7]  Where such a request is erroneously denied, that ruling

---

[7] In light of recent Supreme Court decisions in this area, when a defendant subject to the death sentence requests a mitigation specialist, trial courts should give such requests careful consideration in view of relevant capital litigation precedent and any denial of such a request should be supported with written findings of fact and conclusions of law.  We find unpersuasive the dissent's reliance on a line of cases that precedes the Supreme Court's opinion in Wiggins v. Smith, 539 U.S. 510 (2003).  We note that because there is no professional death penalty bar in the military services, it is likely that a

12

United States v. Kreutzer, No. 04-5006/AR

implicates the right to present a defense, compulsory process, and due process conferred by the Constitution, the right to obtain witnesses and evidence conferred by Article 46, UCMJ, and the right to the assistance of necessary experts conferred by R.C.M. 703(d).  Because Kreutzer was wrongly deprived of the expert assistance of a mitigation specialist to aid in the preparation of this capital case, the Court of Criminal Appeals held that Kreutzer had been denied due process.  Kreutzer, 59 M.J. at 779.  Concerning findings, the lead opinion of the Court of Criminal Appeals concluded:  "Here the judge's abuse of discretion adversely impacted the fairness of the trial on findings as to the issue of premeditation by depriving appellant of a complete presentation of the evidence concerning his state of mind . . . ."  Id. at 779-80.  The Government does not contest the finding that Kreutzer was denied due process.  This error of constitutional magnitude must be tested for prejudice under the standard of harmless beyond a reasonable doubt.  See Chapman, 386 U.S. at 24; United States v. Sidwell, 51 M.J. 262, 265 (C.A.A.F. 1999).  The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is "whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence."  United

mitigation specialist may be the most experienced member of the defense team in capital litigation.

13

United States v. Kreutzer, No. 04-5006/AR

States v. Kaiser, 58 M.J. 146, 149 (C.A.A.F. 2003) (quoting United States v. Davis, 26 M.J. 445, 449 n.4 (C.M.A. 1988)).  We will reverse a conviction unless we find that a constitutional error was not a factor in obtaining that conviction.

The Court of Criminal Appeals found that the denial of a mitigation specialist was a denial of due process and articulated the requirement that a conviction cannot be affirmed if a constitutional error was not harmless beyond a reasonable doubt.  Kreutzer, 59 M.J. at 779-80 (citing Chapman v. California, 386 U.S. 18 (1967)).  This is "a familiar standard to all courts."  Chapman, 386 U.S. at 24.  Nonetheless, the Court of Criminal Appeals went on to misstate the nature of the inquiry.

The Army court defined the constitutional error inquiry as follows:  "In testing for harmless error we inquire 'whether the error itself had substantial influence' on the trial results."  Kreutzer, 59 M.J. at 779 (quoting Pollard, 38 M.J. at 52; Kotteakos, 328 U.S. at 765).  In Pollard we assessed the impact of a trial counsel erroneously reading a victim's pretrial statement to the members in the guise of impeachment -- a nonconstitutional trial error.  38 M.J. at 50-51.  That assessment was to determine if "an error of law . . . materially prejudice[d] the substantial rights of the accused."  Pollard, 38 M.J. at 51-52; Article 59(a), UCMJ, 10 U.S.C. § 859(a)

14

United States v. Kreutzer, No. 04-5006/AR

(2000).   In contrast to asking whether a constitutional error

contributed to a conviction, the quest for a "substantial"

influence seeks a more measurable impact or importance.   When

constitutional error is substantial and, as reflected by

Chapman, where that error contributes to a conviction, the

conviction cannot stand.   We hold that in relying upon Pollard

and testing this error for "substantial influence," the Army

court applied an erroneous definition to the nature of the

inquiry into the effect of constitutional error.[8]   The error is

not material to this appeal, however, because the standard that

the Army court applied found harm under a test more favorable to

the Government than the standard it should have applied.

   This court reviews de novo the issue of whether a

constitutional error was harmless beyond a reasonable doubt.

United States v. Hall, 56 M.J. 432, 436 (C.A.A.F. 2002); United

States v. Grijalva, 55 M.J. 223, 228 (C.A.A.F. 2001).   For that

reason, we can conduct an independent review of the impact of

this constitutional error.   See infra, Section II.

---

[8] In light of this holding and the fact that Pollard is a case
dealing with nonconstitutional trial error, we need not address
the Government's additional contentions regarding application of
Pollard and whether Pollard requires any type of threshold
showing.

b.  Does the majority decision of the Court of Criminal Appeals impeach itself with internally inconsistent statements as to whether denial of a mitigation specialist was harmless?

Arguments:

The Government's argument in support of this contention centers on what appears to be a facial inconsistency in the text of the Court of Criminal Appeals' opinion.  As noted, that court concluded that the Government did not meet its burden of showing that the error in denying a mitigation specialist was harmless beyond a reasonable doubt.  Kreutzer, 59 M.J. at 779-80.  In two footnotes, however, the opinion discusses the test for ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984).  In that context, Judge Clevenger, the author judge, states:

> I specifically do not agree that the prejudice prong of Strickland . . . has been satisfied [as to contested issues in the findings].  Notwithstanding the powerful evidence that raises substantial concerns about the quality of Appellant's mental health, there is still substantial expert opinion evidence of his ability to premeditate and significant direct and circumstantial evidence of the actual process of his alleged premeditation that fact-finders at trial could credit.

Kreutzer, 59 M.J. at 780 n.8 (citation omitted).  Judge Clevenger repeats his conclusion later:

> To reiterate, even assuming the first prong of the Strickland test for ineffective

16

> assistance of counsel were satisfied, I think there was not a reasonable probability that any showing of Appellant's complete mental health status would have overcome the expert opinion evidence of sanity and the direct and circumstantial evidence of premeditation.

Id. at 784 n.11 (citation omitted).

The Government argues that with this language the Court of Criminal Appeals impeached its own decision. In the Government's view Judge Clevenger found that the denial of a mitigation specialist was not harmless beyond a reasonable doubt but also said that the evidence a mitigation specialist would produce had no reasonable probability of changing the result on the findings. The Government argues that this internal inconsistency demonstrates that denial of a mitigation specialist was harmless beyond a reasonable doubt.

Kreutzer disputes the contention that the Army court impeached its own decision by referencing the prejudice test for ineffective assistance of counsel. Kreutzer points out that the test for ineffective assistance involves a different standard and burden when reviewing the effect of denial of competent counsel. He notes that there is no reason to find any inconsistency because it is wholly proper to come to distinct conclusions under two separate tests with the burden falling upon different parties.

United States v. Kreutzer, No. 04-5006/AR

Discussion:

We agree that there is an appearance of inconsistency.  We do not agree, however, that that inconsistency is necessarily erroneous nor do we find that Judge Clevenger impeached his own decision in his footnotes.  Trial and appellate practices are replete with different burdens of proof and persuasion that are allocated to one party or another.

The party benefiting from a constitutional error bears the burden of demonstrating that the error was harmless beyond a reasonable doubt.  Chapman, 386 U.S. at 24; Simmons, 59 M.J. at 489.  See also Kaiser, 58 M.J. at 149 (citation omitted) ("Error of constitutional dimensions requires either automatic reversal or an inquiry into whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction[.]"); Grijalva, 55 M.J. at 228 ("When there has been an error of constitutional dimension, this Court may not affirm unless it is satisfied that the error is harmless beyond a reasonable doubt.").  Thus, in this case, the Government is called upon to show that the error had no causal effect upon the findings.  Specifically, the Government had to demonstrate that there was no reasonable possibility that the absence of a mitigation specialist contributed to the contested findings of guilty.  See Gutierrez v. McGinnis, 389 F.3d 300, 307-08 (2d Cir. 2004).

18

United States v. Kreutzer, No. 04-5006/AR

The test and burden relating to prejudice from ineffective assistance of counsel are different.  If an appellant establishes that counsel was ineffective under the first prong of Strickland, it is the appellant as opposed to any party benefiting from error (in this case, the Government) who bears the burden of demonstrating prejudice.  United States v. Davis, 60 M.J. 469, 473 (C.A.A.F. 2005); United States v. Dewrell, 55 M.J. 131, 133 (C.A.A.F. 2001).  To establish prejudice, the appellant must demonstrate a reasonable probability that, but for counsel's deficiency, the result would have been different. Davis (citing United States v. Quick, 59 M.J. 383, 587 (C.A.A.F. 2004)).  The appellant must demonstrate such prejudice as to indicate a denial of a "fair trial, a trial whose result is unreliable."  Dewrell, 55 M.J. at 133 (citing Strickland, 466 U.S. at 687).  In this setting, overwhelming evidence of guilt may present an insurmountable obstacle to an appellant claiming prejudice from ineffective assistance of counsel.

The tests for determining constitutional harmless error and for determining prejudice under an ineffective assistance analysis are substantially different:  the burden falls on different parties (the Government vs. the appellant); the burdens themselves are different (possibility vs. probability); and different considerations are given to the quality and weight of the evidence of guilt in each test.  In applying the two

19

tests, it is therefore not unreasonable or illogical to come to two different conclusions, even in a single case.  In light of this, and according Judge Clevenger the presumption that he knew the law, we find no impeaching inconsistency within the opinion. See United States v. Eversole, 53 M.J. 132, 138 (C.A.A.F. 2000).

    c.  Is the nature of the mental health evidence potentially gathered by a mitigation specialist relevant to the contested elements of premeditation?

    Arguments:

    The Government acknowledges that general mental health evidence is relevant to establish mens rea, but argues that in this case, due to Kreutzer's specific personality disorders, any potential mental health evidence that a mitigation specialist could have obtained would not be relevant to the findings.  The Government characterizes Kreutzer's mental health history as demonstrating diminished capacity and asserts that because evidence of diminished capacity is not relevant to the issue of mental responsibility, it could not negate the element of premeditation.  Kreutzer, on the other hand, claims that a mitigation specialist would have identified additional mental health evidence as well as helped defense counsel identify and better use experts.  Kreutzer asserts that in the end a mitigation specialist would have substantially contributed to presenting a more coherent and stronger mental health theory at

trial and that it is possible the members, or at least one member, could have come to a different conclusion on findings.

Discussion:

Under the circumstances of this case we disagree with the Government's generalization that none of the mental health evidence that was available could or would have an impact upon a member's determination of premeditation. We have not limited military justice jurisprudence to a narrow use of mental health evidence. Indeed, Ellis v. Jacob, 26 M.J. 90, 93 (C.M.A. 1988), dispelled any construction of Article 50a(a), UCMJ, 10 U.S.C. § 850a(a) (2000), that would eliminate evidence of mental conditions relevant to premeditation, specific intent, knowledge, or willfulness, i.e., elements of offenses. See also United States v. Schap, 49 M.J. 317, 322 (C.A.A.F. 1998).

The record reflects a wealth of mental health information in this case. A mix of psychological and psychiatric professionals were involved with Kreutzer both before and after the offenses. One mental health professional, Dr. (Colonel) Robert Brown Sr., opined that Kreutzer was "chronically and seriously mentally ill." This particular information was not known to Kreutzer's defense counsel prior to trial. Properly prepared and presented, testimony of this nature arguably could go beyond demonstrating diminished capacity and be a substantial part of a defense against the premeditation element. As Judge

United States v. Kreutzer, No. 04-5006/AR

Clevenger's lead opinion for the Court of Criminal Appeals

points out:

> The mitigation specialist's role would be to
> gather and collate appellant's civilian and
> military history with a view to the
> psychiatric issues that would help explain
> appellant's state of mind at the critical
> time of the shooting.  One could speculate
> endlessly on what such an expert, if
> provided, would have done to help the
> detailed defense counsel assess the whole
> story . . . ."

Kreutzer, 59 M.J. at 778-79.  Amidst the "wealth of relevant

information available to discover, investigate, preserve,

analyze, evaluate and potentially exploit at trial in defense of

the premeditation allegations," Judge Clevenger found "most

telling" the fact that Dr. Brown's "potentially powerful,

exculpatory mental status evidence was not discovered by, or

known to the defense counsel, at the time of trial."  Id. at

779.

The Government must show there is no reasonable possibility

that even a single court member might have harbored a reasonable

doubt in light of the mental health evidence that the mitigation

specialist could have gathered, analyzed, and assisted the

defense to present.  Had but a single member harbored a

reasonable doubt, death would have been excluded as a

permissible punishment.  The Government has not met its burden

of demonstrating that a mitigation specialist could have done

nothing to assist counsel to present additional evidence of

22

Kreutzer's mental health that would not have had an impact on the premeditation element for at least one court member.

## II.

### De novo review for harmlessness beyond a reasonable doubt

We have held in this opinion that the Court of Criminal Appeals applied an incorrect definition to the nature of the constitutional harmless error inquiry and that we review de novo the impact of that error in this case. Kreutzer urges us to affirm the Court of Criminal Appeals regardless of the error. He argues that if the Government could not meet the erroneous lower standard applied by the Army court, then it surely could not demonstrate that the error in denying the mitigation specialist was harmless beyond a reasonable doubt.

The Government must demonstrate there is no reasonable possibility that the absence of a mitigation specialist contributed to the contested findings of guilty or, in this case, that not even a single member would have harbored a reasonable doubt after considering the mental health evidence that the mitigation specialist could have gathered, analyzed, and assisted the defense in presenting. We do not believe that the Government has met that burden.

To place this discussion in its proper context, it is necessary to examine the role of a mitigation specialist in

capital litigation, both generally and in this case.  The

general role of a mitigation specialist was discussed in a

report adopted by the Judicial Conference of the United States:

> Mitigation specialists typically have graduate
> degrees, such as a Ph.D. or masters degree in social
> work, and have extensive training and experience in
> the defense of capital cases.  They are generally
> hired to coordinate an investigation of the
> defendant's life history, identify issues requiring
> evaluation by psychologists, psychiatrists or other
> medical professionals, and assist attorneys in
> locating experts and providing documentary material
> for them to review.[9]

The American Bar Association recommends the inclusion of a

mitigation specialist on every capital litigation defense team

and identifies the mitigation specialist as a "core member" of

the defense team:

> A mitigation specialist is also an indispensable
> member of the defense team throughout all capital
> proceedings.  Mitigation specialists possess clinical
> and information-gathering skills and training that
> most lawyers simply do not have.  They have the time
> and the ability to elicit sensitive, embarrassing and
> often humiliating evidence (e.g., family sexual abuse)
> that the defendant may have never disclosed.  They
> have the clinical skills to recognize such things as
> congenital, mental or neurological conditions, to
> understand how these conditions may have affected the
> defendant's development and behavior, and to identify
> the most appropriate experts to examine the defendant
> or testify on his behalf.  Moreover, they may be
> critical to assuring that the client obtains
> therapeutic services that render him cognitively and

---

[9] Judicial Conference of the U.S., Subcomm. on Federal Death
Penalty Cases, Comm. on Defender Services Federal Death Penalty
Cases:  Recommendations Concerning the Cost and Quality of
Defense Representation 24 (1998).

emotionally competent to make sound decisions concerning his case.[10]

When Kreutzer's defense attorneys made their requests for a mitigation specialist they supported it with an affidavit from Dr. Lee Norton, Ph.D., a mitigation specialist. Doctor Norton provided extensive background on what a mitigation specialist could provide in regard to mental health evidence.[11] In addition to the general importance of a mitigation specialist in death penalty cases, mitigation specialists may play a particularly important role in ensuring the fair and full adjudication of military death penalty cases where, as here, counsel have little training or experience in capital litigation.

This case is replete with evidence or information indicating that Kreutzer's mental health was dubious. Yet the

---

[10] American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Commentary to Guideline 4.1 (revised ed. 2003) (footnote omitted), reprinted in 31 Hofstra L. Rev. 913, 959 (2003) [hereinafter Commentary to ABA Death Penalty Counsel Guideline 4.1].

[11] Dr. Norton noted that a mitigation specialist gathers all pertinent information including all private medical records relating to mental health and mental health care, all social services records relating to mental health treatment, and all military medical records. Collection of mental health data is accompanied by "comprehensive interviews" of lay and professional persons who have observed the accused and have some knowledge of his mental health conditions. These people include, but are not limited to, family, friends, teachers, coworkers, employers, doctors, mental health and social services personnel, and military peers and superiors. This mental health data and related interviews detect evidence of early signs of mental illness or deficiencies as well as give a portrayal of the onset, course and treatment of mental disorders.

presentation of the defense case-in-chief includes testimony from only three individuals about Kreutzer's performance, behavior and reputation, and expert testimony from a single mental health professional. Color Sergeant David Wakeland[12] testified that Kreutzer was an average or above-average soldier and noncommissioned officer. He also discussed some matters that may have been stressful for Kreutzer as well as how Kreutzer's threats and absence were reported on the morning of the shooting.

Specialist Robert Harlan, Kreutzer's roommate, testified about the ridicule Kreutzer endured, an incident involving threats while the unit was in the Sinai, the chain of command's treatment of Kreutzer, and Kreutzer's emotional state on the day before the shooting. A stipulation of the expected testimony of Sergeant Arthur Swartz provided a further indication that Kreutzer was not respected in the unit.

The only mental health professional called by the defense on the merits was Doctor (Major) Carroll J. Diebold, the Chief of the Department of Psychiatry and Neurology at Womack Army

---

[12] Color Sergeant Wakeland was a member of the British Army assigned to Fort Bragg and who served as Kreutzer's platoon sergeant. He testified that the rank of color sergeant was the equivalent of an E-8 (master sergeant) in the United States Army.

Medical Center, Fort Bragg, North Carolina.[13]  Accepted as an expert in the fields of psychiatry and forensic psychiatry, Dr. Diebold participated in a sanity board evaluation of Kreutzer in December 1995.  He described how the sanity board had proceeded and testified that the board found Kreutzer to have "an adjustment disorder with mixed anxiety and depressed mood" and "dysthymia," which is "low grade depression."  Generally, Dr. Diebold testified that a person with these personality traits would react to stress with a "spike" into a "detrimental behavior zone."  Finally Dr. Diebold opined that factors similar to those Kreutzer experienced prior to the shooting "would produce a narcissistic injury and an interpretation by Sergeant Kreutzer as a threat on his own character" and cause the "spike" effect.

Trial counsel noted in closing that Dr. Diebold said Kreutzer's mental disorders "are not even considered severe" and contrasted that with defense counsel's opening statement promising to show that Kreutzer "was suffering from a severe personality disorder."  Trial counsel also reminded the members that Dr. Diebold testified that none of Kreutzer's disorders impaired the formation of the intent to kill or the ability to premeditate.  Kreutzer's defense counsel responded that

---

[13] Doctor Diebold was called as a defense witness despite his recommendation to defense counsel "that they should reconsider

Kreutzer's actions before the shooting were a "cry for help."
He argued that when the unit started moving out for the run,
Kreutzer "spiked" due to the stress and formed the intent to
pull the trigger, but that he never intended to kill, nor did he
premeditate.

Despite the rather limited defense mental health
presentation on the merits, the record on appeal reveals
significant additional mental health evidence potentially
available to the defense. Doctor Darren Fong, the first mental
health professional with whom Kreutzer spoke did not testify.
Kreutzer spoke with Dr. Fong about killing members of his unit.
However, rather than believing that Kreutzer's homicidal
ideation was serious, Dr. Fong believed that Kreutzer had
"problems with anger and very poor coping skills,"
"interpersonal problems," and "probably a history of
psychological problems."

After he was apprehended, Kreutzer saw Dr. (then-Captain)
Wendi T. Diamond, the division psychiatrist for the 82d Airborne
Division at Fort Bragg. Doctor Diamond indicated that "[n]ever
in all my life had I seen someone in so much psychic distress."
She believed that Kreutzer "was not at all rational during our
conversation" and that his thoughts were "disordered." Doctor

---

calling me to testify" and he specifically indicated that his
"testimony might not be helpful in front of the panel."

Diamond was not contacted by the trial or defense counsel prior to trial, a fact that surprised her because she "believed that both sides could have benefited from [her] assessment of SGT Kreutzer's mental state very close to the time of the offenses." The potential value of Kreutzer's discussions with Dr. Diamond to the defense is underscored by the comments of a Government lawyer who observed that interview: "Conclusion: Prepare for Insanity Defense! This guy is nutty [sic] than a fruit cake." Kreutzer, 59 M.J. at 777.

In pretrial confinement Kreutzer was seen for a suicide assessment by Lieutenant Commander Drew Messer who received his professional training in a dual degree law and psychology program. Lieutenant Commander Messer concluded that Kreutzer was "profoundly depressed" and felt that "there were definite mental health issues in the case." Nonetheless, he never met with any of Kreutzer's defense attorneys.

At the defense's request, mental health professionals at the Walter Reed Army Medical Center Forensic Psychiatric Program were appointed as expert consultants to the defense. Doctor Robert S. Brown Sr. was a consultant to the Forensic Psychiatric Program and participated in evaluating Kreutzer's mental condition. Doctor Brown met with Kreutzer on April 11, 1996 and delivered a written report to Dr. Lande, Chief of the Forensic Psychiatric Program, on that same day. Doctor Brown's report

29

opined that Kreutzer was "chronically and seriously mentally ill" and that the offenses were "causally related to his mental illness." While defense counsel did have discussions with Dr. Lande, they were not aware of Dr. Brown or his written evaluation until after trial.

A post-trial mitigation specialist's report was attached as part of the appellate record. This report reveals that Kreutzer suffered mental and emotional problems prior to entering the Army. He lacked self-confidence and held himself in low esteem, feelings that became worse during junior high school. Symptoms of depression began when Kreutzer was twelve and increased during his high school years when he also experienced suicidal ideation. Kreutzer continued to be depressed and experienced his first homicidal feelings during his college years. His suicidal ideation manifested itself even more during his college years when he pointed loaded weapons at his head several times.

In contrast to this wealth of mental health information and history favorable to a defense presentation, there is mental health evidence that would indicate that Kreutzer premeditated his actions and was mentally responsible. Doctor Rollins, a privately employed forensic psychologist opined that Kreutzer had no severe mental disorder and was competent to stand trial. Doctor Rollins was not employed by the defense to serve as an expert consultant or witness because of financial

considerations, but he recommended that the defense put its main effort into the case in mitigation.  Further, a sanity board found Kreutzer competent and not to be suffering from a severe mental disease or defect.

The Government also points to the "interim report" prepared by a mitigation specialist on behalf of the defense for appellate litigation.  The Government notes that this appellate mitigation specialist's report considered the foregoing evidence pertaining to Kreutzer's mental health and makes no conclusion of lack of mental responsibility or health that would overcome premeditation.  Therefore, the Government argues that the mitigation specialist, if provided at trial, would have been relevant only to sentencing and not to findings, and that any error is therefore harmless beyond a reasonable doubt.

We are not persuaded that the Government has met its burden of showing that Kreutzer could not have possibly benefited from the talent and expertise of a mitigation specialist on findings. We need not speculate on precisely how the wealth of mental health evidence could have been used at trial.  Although capital cases do not confer a per se right to a mitigation specialist, on a case-by-case basis servicemembers confronted with a capital prosecution are entitled to mitigation specialists where their services would be necessary to the defense team.  We believe that the Government gives too little weight to the possible

worth of a mitigation specialist in this case. The UCMJ and the R.C.M. assure that the defense counsel has the resources, including expert assistance, to prepare and present the defense. See Article 46, UCMJ; R.C.M. 703. The military accused's rights in this regard are not dependent upon indigence, nevertheless we agree with the spirit of the Arizona Supreme Court's statement that "[s]o long as the law permits capital sentencing," the justice system "must provide adequate resources to enable indigents to defend themselves in a reasonable way." See State v. Bocharski, 22 P.3d 43, 55 (Ariz. 2001).

While the services of a mitigation specialist are commonly used in sentencing, in the appropriate case this expert assistance may be necessary to the defense on findings as well. As the Commentary to ABA Death Penalty Counsel Guideline 4.1 states, the mitigation specialist is an "indispensable member of the defense team throughout all capital proceedings." Kreutzer's three uniformed attorneys recognized that they could not gather, analyze, and formulate this mental health evidence; a mitigation specialist could have done so and assisted counsel in identifying qualified mental health experts to present the evidence on both the merits and on sentencing. In turn, the defense on the merits could have incorporated that analysis either to bolster the theory that was used at trial or to create a different theory to contest premeditation on the merits. For

example, the defense might have used testimony from Dr. Fong to show that he did not take Kreutzer's talk about killing seriously and that Kreutzer had a history of homicidal ideation. The defense could have then argued that the members should discount Kreutzer's night-before statements to SP4 Mays because they were more homicidal fantasy than premeditation. Alternatively, defense counsel might have argued that the additional mental health information produced by a mitigation specialist demonstrated that Kreutzer was susceptible to stress stimuli and was exhibiting "spiked" behavior as opposed to a premeditated intent in committing his crimes. Further, defense counsel may have used the additional information to attack and cloud the findings of the sanity board and try to suggest that while Kreutzer might have been mentally responsible under the law, he did not have the mental capacity to premeditate his crimes. The question is not whether these arguments are persuasive in the abstract, but rather, in light of the fact that Kreutzer was denied the fair opportunity to make these arguments, whether the Government has shown that the error in denying the defense request for a mitigation specialist was harmless beyond a reasonable doubt.

We answer the certified question in the negative. Erroneous denial of Kreutzer's request for a mitigation specialist was error of constitutional magnitude. As such, the

United States v. Kreutzer, No. 04-5006/AR

Government must show there was no reasonable possibility that even a single court member might have harbored a reasonable doubt in light of the mental health evidence that the mitigation specialist could have gathered, analyzed, and assisted the defense to present.  Had but a single member harbored a reasonable doubt, death would have been excluded as a permissible punishment.  In light of these factors, including the relative experience and training of Kreutzer's defense counsel in capital litigation and the evidence relating to Kreutzer's mental health history, we hold that the Government has not met its burden of demonstrating that the error in denying Kreutzer's request for employment of a mitigation specialist was harmless beyond a reasonable doubt as to the contested findings.


DECISION

The certified question is answered in the negative and the decision of the United States Army Court of Criminal Appeals is affirmed.

United States v. Kreutzer, No. 04-5006/AR

CRAWFORD, Judge (dissenting):

I respectfully dissent from the majority's expansion of Ake v. Oklahoma, 470 U.S. 68 (1985), by finding in the U.S. Constitution a right of an accused to a death penalty mitigation specialist on the defense team, without the accused first demonstrating the need for such an expert.  In granting this right of "constitutional magnitude," 61 M.J. ___ (13), the majority places this Court outside of the judicial mainstream. The majority fails to consider the opinions of federal and state courts regarding the right to a capital mitigation specialist, the expertise and funding provided to the defense at trial, and recent precedent from this Court, as well as the majority of the decisions by federal and state courts ruling on the law-of-the-case doctrine.

FACTS

Prior to trial, the military judge made available to the defense team six psychiatrists in the Psychiatric Department at Walter Reed Army Medical Center, including the former chief psychiatrist, who is a certified forensic psychiatrist and lawyer.  Additionally, this psychiatric team would work together with consultants at the National Naval Medical Center.  The defense agreed that this team of psychiatrists was more than adequate.  The convening authority also assigned a noncommissioned officer (NCO) investigator and provided funding

for the defense team.  Later, the defense requested the services

of a "mitigation specialist" because the "defense counsel lacked

the experience and scientific expertise to uncover all

potentially mitigating events or factors" in Appellee's case.

The defense argued "we're not qualified to do the job of

psychologists, psychiatrists, and social workers that require

years of training in and of itself.  To ask an attorney to

compress and consolidate years of training into a few months is

neighwell [sic] impossible, sir."  The military judge denied the

request, relying on United States v. Loving, 41 M.J. 213, 250

(C.A.A.F. 1994), which states:

> While use of an analysis prepared by an independent
> mitigation expert is often useful, we decline to hold
> that such an expert is required.  What is required is
> a reasonable investigation and competent presentation
> of mitigating evidence.  Presentation of mitigation
> evidence is primarily the responsibility of counsel,
> not expert witnesses.

Alternatively, the defense asked the military judge to provide

Appellee's defense team with travel funds associated with

building Appellee's case.  The judge granted the request for

travel funds and told them to return if they did not receive the

funds they wanted.  Id.  The defense did not return for

additional funding.  Based on the defense's extensive traveling

and the fact they did not seek additional funding, we may infer

the defense received all the funding they needed.  There simply

is no evidence that funding was limited.

2

On appeal, two judges on the Court of Criminal Appeals (CCA) found that the military judge abused his discretion in denying a request by the defense counsel for an expert mitigation specialist, and that this denial was not harmless beyond a reasonable doubt.  United States v. Kreutzer, 59 M.J. 773, 779-80 (A. Ct. Crim. App. 2003).  The panel unanimously found ineffectiveness of counsel during the sentencing portion of the trial.  Id. at 780-85.

## DISCUSSION

The Judge Advocate General certified the issue of whether that court "[1] erred when it found [2] denial of a [3] mitigation specialist to be [4] prejudicial error for findings" when it also "found that all evidence that the mitigation specialist would have discovered would not have a reasonable probability of producing a different result."  The certified issue asks us to determine whether there was a "denial" of a "mitigation specialist" and, if so, whether that "denial" was "prejudicial error for findings."

At the outset, we must determine the source of the right at issue and what standard should be applied on appeal.  Only after making this determination can we examine the standard of review by which to assess whether any error may be prejudicial.  If there was error, we must also determine whether that error was prejudicial for findings, and, if so, whether that holding is

3

consistent with an established approach of assessing the case for a "reasonable probability of a different result."

The certified issue asks us to examine the holding of the court below pertaining to findings, wherein the court stated, "defense counsel's investigation into appellant's mental health background fell short of reasonable professional standards," and two of the judges agreed that this deficiency concerning expert opinion evidence would have a direct impact on the issue of mental responsibility and premeditation. Kreutzer, 59 M.J. at 784 n.11.

### Authority to Consider the Issues

The majority would hold that the Judge Advocate General has not certified the question of a right to a mitigation specialist. That issue, however, is intertwined with the issues certified in this case. Note that the CCA held that Appellee was wrongly deprived of expert assistance of a mitigation specialist to aid in the preparation of this capital case and that this was a denial of due process. Id. at 779. Affirming the CCA, the majority holds that there was "a constitutional error" and that "[w]hen a constitutional error is substantial and . . . where that the error contributes to a conviction, the conviction cannot stand." 61 M.J. ___ (15).

In this case, the majority fails to consider the majority of the decisions by federal and state courts ruling on the law-

4

of-the-case doctrine and does not recognize cases that have been decided by this Court since United States v. Grooters, 39 M.J. 269 (C.M.A. 1994).[1]  "Law of the case" may mean different things to different people, but it does not mean that the highest court that oversees the military justice system is bound by erroneous interpretations of law by the courts of criminal appeals.[2] Certainly, where the military judge and the court below are correct, there is no reason to reexamine the ruling.  See, e.g., United States v. Daniels, 60 M.J. 69, 71 (C.A.A.F. 2004).  If the court below is wrong on a constitutional question, however, this Court is not bound by that ruling, and the standard of review is de novo.

No Right to a Mitigation Specialist

While the Supreme Court has not addressed whether there is a constitutional right to obtain a mitigation specialist, a

---

[1] United States v. Williams, 41 M.J. 134, 135 n.2 (C.M.A. 1994). ("The law-of-the-case doctrine does not preclude this Court, once the case has been properly granted for review, from considering an erroneous conclusion of law, made by" the court below.); United States v. Morris, 49 M.J. 227, 230 (C.A.A.F. 1998) (Court limited law-of-the-case doctrine).

[2] It is illogical to say that an intermediate appellate court can bind a higher court.  See, e.g., England v. Hospital of Good Samaritan, 97 P.2d 813, 814-15 (Cal. 1939); New York Life Insurance Company v. Hosbrock, 196 N.E. 888, 890 (Ohio 1935). See also Castro v. United States, 540 U.S. 375, 383-84 (2003)("The law-of-the case doctrine cannot pose an insurmountable obstacle to our reaching [our] conclusion. Assuming for argument's sake that the doctrine applies here, it simply 'expresses' common judicial 'practice'; it does not limit the courts' power.").

majority of federal and state courts have held that a capital defendant is not entitled to a mitigation specialist as a constitutional right.[3]  Ake did not hold that the defendant has a right to a capital mitigation specialist.  Rather, the Supreme Court held that where there is a serious question about lack of mental responsibility, that is, where the defense has made a "preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial," the defendant is entitled to a psychiatric examination.  Ake, 470 U.S. at 74.  The majority stressed that the ruling was based on the fact that the defendant's mental condition at the time of the offense was "seriously in question."  Id. at 82.  According to the Court:

> [W]hen a defendant demonstrates to a trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

Id. at 83.  Both the federal and state courts have resisted an expansive reading of Ake.

---

[3] State v. Lott, Nos. 66388, 66389, 66390, 1994 Ohio App. LEXIS 4965 at *35, 2002 WL 615012, at *13 (Ohio Ct. App. Nov. 3, 1994)(mere assertion that the assistance of an expert would be useful was an insufficient basis on which to grant relief); State v. Langley, 839 P.2d 692, 697 (Or. 1992)(denial of mitigation investigator was not error); Commonwealth v. Reid, 642 A.2d 453, 457 (Pa. 1994)(failure to approve funds to obtain particular psychologist as mitigation expert did not violate Ake).

After Ake, the Court held that its decision should not be construed to compel the Government to provide an indigent with the assistance of an expert outside the limited circumstances of Ake. Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985)("We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought," i.e., a criminal investigator, a fingerprint expert, and a ballistic expert). Both Ake and Caldwell emphasize the minimum showing required of the defense. Like our cases, Ake sets out a balance among private interests, Government interests, and the probative value of testimony sought, noting that mental condition evidence may be crucial to the defense. But the defense must establish that fact. Both the precedent of federal and state courts and our own precedent require that the defendant show the necessity for expert assistance and that the lack of such assistance would result in a fundamentally unfair trial. See, e.g., Moore v. Kemp, 809 F.2d 702, 712 (11th Cir. 1987); Gray v. Thompson, 58 F.3d 59, 66-67 (4th Cir. 1995), vacated on other grounds, Gray v. Netherland, 518 U.S. 152 (1996); Little v. Armontrout, 835 F.2d 1240, 1244 (8th Cir. 1987).

In People v. Burt, 658 N.E.2d 375 (Ill. 1995), the court stated that Ake does not compel the appointment of a mitigation specialist. Id. at 389 (citing People v. Lear, 572 N.E.2d 876

7

(Ill. 1991). The Supreme Court of Illinois stated that: "We have specifically held that a trial court is not constitutionally required to appoint a mitigation expert, or even an investigator, because defense counsel is capable of obtaining and presenting such information." Id. The court noted further that "[E]ven Ake did not provide that the indigent defendant has a constitutional right to choose a particular psychiatrist or receive funds to hire his own." Id. As in Appellee's case, the Burt court noted that defendant was given the assistance of counsel, an investigator, and a psychologist for the purposes of securing and presenting mitigating evidence. Id. There was adequate assistance and, accordingly, no violation of the defendant's constitutional rights in failing to appoint a mitigation specialist. Id.

Similarly, in Stewart v. Gramley, 74 F.3d 132 (7th Cir. 1996),[4] the court held that counsel was not ineffective in failing to talk to the members of Stewart's family or other potential witnesses. Id. at 135. Members of his family and other witnesses did testify on his behalf during the sentencing proceedings, but had not been interviewed in advance. Id. Failure to investigate whether he had used drugs or had a history of drug use did not show ineffectiveness. Id. What

_____

[4] See also State v. McGuire, 686 N.E.2d 1112, 1120 (Ohio 1997) (hiring a mitigation specialist is not a requirement of effective assistance of counsel).

counsel must do in mitigation is "less clear," the court said. Id. What is clear, however, is that the courts apply a Strickland standard. Id.

The Stewart court also held that a defendant does not have the right to introduce causality evidence under a Strickland analysis. Id. at 136. Prior to Stewart, the Seventh Circuit held in Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir. 1989), that a lawyer "must make a 'significant effort, based on reasonable investigation and logical argument'" to discover mitigating evidence. In Stewart, however, the court clarified the rule and indicated that where there is no outward appearance that the defendant has some mental condition or impairment, counsel may surmise after talking to the defendant that such an investigation would be fruitless. 74 F.3d at 135. The court recognized that defense lawyers have limited resources and only a short period of time to prepare for sentencing. Id. Thus, they do not have to investigate the "defendant's past with the thoroughness of a biographer." Id.

In Stewart, the court refused to accept the causality approach towards mitigating evidence, recognizing the "slippery slope" created by the assumption that one's past essentially influences everything. See id. at 136. Under the causality approach to analyzing childhood environment and criminal activity, the fact-finders are invited to conclude that a

disadvantaged childhood environment makes individuals less legally responsible as adults. The fact-finders are asked to accept, for instance, that murderers are compelled to murder because of their past, and that they should be excused because the past may essentially influence everything they do in the future.

As discussed above, the Supreme Court has not held that there is a constitutional right to a mitigation specialist. In light of this, we should carefully distinguish this case from Wiggins v. Smith, 539 U.S. 510 (2003). Wiggins is not inconsistent with the federal and state cases that hold there is no right to a capital mitigation specialist and certainly does not overrule Loving. In Wiggins, the Supreme Court held the defense attorney's failure to investigate the defendant's background and present mitigating evidence concerning his difficult life constituted ineffectiveness of counsel. Id. at 515-38. The evidence in Wiggins was "relevant to assessing defendant's moral culpability." Id. at 535. "Wiggins experienced severe privation and abuse in his first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." Id. The Court noted that lawyers are not required to present "every conceivable line of mitigating evidence" or to pursue a

10

mitigating defense in every case. Id. at 533. But they should discover all "reasonably available mitigating evidence." Id. at 524. If they decide not to pursue evidence, that should be supported by "reasonable professional judgment." Id. at 521. "Given both the nature and extent of the abuse petitioner suffered, [the Supreme Court found] there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing and in an admissible form." Id. at 535. The Court found that the record strongly suggested that counsel's failure to investigate thoroughly the defendant's personal history resulted from inattention. "Counsel's decision not to expand the investigation beyond the PSI [presentence investigative report] and the DSS [Department of Social Services] record fell short of the professional standards that prevailed in Maryland [at the time of trial]." Id. at 524. The standard remains that failure to present mitigating evidence is not per se ineffectiveness of counsel, because there may very well be tactical reasons for not introducing certain documents and testimony, for example, opening the door to inadmissible evidence or privileged information. See, e.g., United States v. Dupas, 14 M.J. 28 (C.M.A. 1982).

Not only does Wiggins not change the case law as to ineffectiveness of counsel, but the facts in Wiggins are so

clearly distinguishable from those in Appellee's case that, as a legal precedent, Wiggins is inapposite.  Unlike Wiggins, Appellee's counsel was not inattentive to his background. Appellee's counsel assembled an extensive defense team of counsel, psychiatrists, and an NCO investigator with unlimited travel funds to investigate and gather mitigating evidence. This team had the report of the investigation pursuant to Article 32, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 832 (2000), and numerous psychological reports based on various tests performed on Appellee.  The testing and conclusions of these experts were confidential because they were made by individuals working as members of the defense team.

## Unwarranted Remedy

Rather than ordering a hearing under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), ordering affidavits from defense counsel as to the reason for their decisions, or even presuming that the defense team exercised reasonable professional judgment, the majority reverses the findings.

In leaping beyond the guidance of the Supreme Court to find this right of "constitutional magnitude," the majority relies upon "the right to present a defense, compulsory process, and due process conferred by the Constitution," the UCMJ, and the Rules for Courts-Martial.  61 M.J. ___ (13).  This is unfortunately consistent with this Court's recent overreliance

12

United States v. Kreutzer, No. 04-5006/AR

on due process, often without articulation of the source for that reliance.  See, e.g., United States v. Richardson, 61 M.J. 113 (C.A.A.F. 2005); United States v. Jones, 61 M.J. 80 (C.A.A.F. 2005); United States v. Oestmann, 61 M.J. 1003 (C.A.A.F. 2005); United States v. Cosby, No. 05-0058, 2005 CAAF LEXIS 411 (C.A.A.F. Apr. 15, 2005); United States v. Moreno, 61 M.J. 59 (C.A.A.F. 2005); United States v. Brewer, 61 M.J. 51 (C.A.A.F. 2005); United States v. Strother, 60 M.J. 476 (C.A.A.F. 2005).  All too frequently, "due process" becomes the mantra of those who seek enforcement of certain rights when there is no specific source for those rights to which they can readily turn.  The majority's invocation of "due process" is ill placed because Appellee had both articulable rights and a highly competent team dedicated to protecting those rights.  A competent defense counsel must prepare for sentencing as well as the case-in-chief.  Mitigation evidence places the defendant's crime in the social context of his or her life experiences and suggests psychologically important events that could have shaped or influenced the defendant's criminal acts.  This is particularly important where there is a pattern of early childhood trauma and maltreatment, or where there has been poverty and childhood abuses and a nexus linking those experiences with an individual's dysfunction as an adult.

13

The team assembled on behalf of Appellee, the funding of that team, and the funding that could have been obtained in the future, likely provided all that was necessary to assist the defense in lending context to Appellee's life experiences and the impact they had on his criminal acts.[5] The military justice system provides for open access to mitigation evidence during sentencing, subject to the effectiveness of the information and the limits imposed by rules governing admissibility. In many cases, counsel has to decide whether the past actions are mitigating evidence or aggravating evidence. The defense team was well aware of numerous statements made by Appellee while in the Sinai.[6] They were careful to avoid the admission of this material at either the findings or sentencing phases. We should not simply guess or presume that they failed to make that decision. We should avoid second-guessing counsel because of the wide latitude they must be given as to their tactical decisions, especially in light of potential rebuttal by the Government, i.e., Appellee's prior statements or evidence to be

---

[5] This team, in making their conclusions, considered all of the reports, including that of Dr. Robert Brown who concluded, "The impulse to commit these crimes could not have been resisted by the defendant."

[6] There are numerous examples. He told Private First Class Cooper: "I'll leave the guard tower, take out the radio watch guard station outside the arms room, and go into the barracks and shoot everyone inside, except for Corporal Hoyler, who I'd just beat pretty badly." And he told Specialist Estrada, "I'm going to kill you" (during the fight in the Sinai).

14

introduced under Military Rule Evidence (M.R.E.) 404(b).  The

defense was very careful not to open the door for a series of

statements made by Appellee while in the Sinai.  These included

the statements of Private First Class (PFC) Bridges, PFC Cooper,

Specialist (SP) Cruz, SP Harlan, Corporal Hyler, SP Estrada,

Sergeant First Class Kearns, and Saul Alvarado.  These

statements would have been devastating evidence if admitted

during the findings phase and had the potential to seal

Appellee's fate during sentencing.  Similarly, the expansive

testing and interviews done by the mental health team may have

also resulted in opening the door to extensive statements from

Appellee that would have been otherwise privileged and therefore

inadmissible.  See, e.g., M.R.E. 302(b).

The CCA was correct in stating that there is a relationship

between a mitigation specialist and the effective assistance of

counsel.  However, the defense's proffer did not satisfy what

this Court has required for the appointment of expert

assistance.  In United States v. Gonzales, this Court set forth

a three-prong test for showing the need for expert assistance:

> First, why the expert assistance is needed.  Second,
> what would the expert assistance accomplish for the
> accused.  Third, why is the defense counsel unable to
> gather and present the evidence that the expert
> assistant would be able to develop.

39 M.J. 459, 461 (C.M.A. 1994).

15

Appellee's counsel failed to satisfy Gonzales by overlooking the team that had been appointed, making no proffer as to what this team could not accomplish that a mitigating specialist could accomplish, and making no showing that "defense counsel is [in]capable of obtaining and presenting" the evidence that could be obtained by a mitigation specialist.  Burt, 658 N.E.2d at 389 (citing Lear, 572 N.E.2d at 880).

As we said in United States v. Kelly, 39 M.J. 235, 238 (C.M.A. 1994):  "[d]efense counsel are expected to educate themselves to obtain competence in defending an issue presented in a particular case," using the primary and secondary sources that would be available prior to asking for a defense specialist.  After a uniquely qualified psychiatric team was assembled, in this case the defense never indicated that they did not have available psychological records, including mental health evaluations and social service records.  Additionally, while the military judge denied the request for a mitigation specialist, he did provide the alternative of government funding for the defense team's mitigation efforts.  The military judge also indicated if there was "any problems in getting the funding," they should seek his assistance.  Id.  The defense never returned to the military judge for additional assistance in the way of experts, investigators, or additional attorneys.

As to the mitigation specialist, the psychiatrists from Walter Reed Army Medical Center and from the National Naval Medical Center had access to numerous psychologists and social workers to perform various tests on Appellee.  Their conclusions and findings were confidential as a result of their appointment to the defense team.  M.R.E. 502(b)(2).  They spent numerous hours obtaining psychological testing and interviewing witnesses, including family members.  Rather than recognize that a blind "shotgun" presentation of all possible mitigation evidence would waive the confidentiality of the communication between this team and defense counsel, the majority second-guesses the defense team and reverses the findings.

The drastic remedy granted by the court below and approved by the majority is beyond comparison to any federal or state case, particularly given the expansive defense team, the lack of any limitation on money or time, and the military judge's invitation to seek the court's assistance to obtain additional money should that become necessary.  Without question, the defense team knew both the procedural and evidentiary rules critical to the presentation of an effective mitigation case. In fact, Dr. Gregory R. Lande was an editor of Principles and Practice of Military Forensic Psychiatry (1997)(along with Dr.

David Armitage[7]) and a former chief of the Psychiatric Department at Walter Reed Army Medical Center.  If we cannot presume that the defense team here acted with Appellee's best interests in mind, the presumption will never be available.

For all of the above reasons, I respectfully dissent from the majority's conclusion that there was an "error of constitutional magnitude" because no mitigation specialist was appointed.

---

[7] Dr. Armitage was part of the defense team of numerous cases. See, e.g., United States v. Gray, 51 M.J. 1, 41 (C.A.A.F. 1999); Loving, 41 M.J. at 249.